**COMMONWEALTH of Pennsylvania,
Appellee,**

v.

**Matthew LAWLEY, Appellant.**

Superior Court of Pennsylvania.

Submitted June 28, 1999.
Filed Oct. 12, 1999.

Peter C. Hall, Asst. Public Defender, Doylestown, for appellant.

Gayle M. Baker, Asst. Dist. Atty., Doylestown, for Com., appellee.

Before McEWEN, President Judge, CERCONE, President Judge Emeritus, and HESTER, J.

CERCONE, President Judge Emeritus:

¶ 1 Appellant Matthew Lawley appeals from the judgment of sentence imposed after his conviction on the charges of robbery, (18 Pa.C.S.A. § 3701(a)(1)(iv)), theft by unlawful taking (18 Pa.C.S.A. § 3921) and receiving stolen property (18 Pa. C.S.A. § 3925). We affirm.

¶ 2 The Trial Court has aptly set forth the facts of this case as follows:

On December 19, 1997 at approximately 10:00 a.m., a man wearing a black stocking mask, a black peacoat, black lowtop Reebok shoes, latex rubber gloves, black pants with three white stripes running down the legs and carrying a book bag, entered the Willow Grove Bank in the Warminster Square Shopping Center in Warminster, Pennsylvania. This man vaulted over the customer service counter, landing in the work area of the bank employees. The assailant stood next to a teller, Rose Ann Messina and told her not to move while he opened her teller drawer and removed all the currency with the exception of one-dollar bills and five twenty-dollar bills held together with a paper clip, which was known as bait money to all bank employees. *See* N.T., 7/28/98, pp. 46. After extracting the money from Ms. Messina's drawer, the intruder screamed, "Where is the rest of your money?", to which Ms. Messina responded that she did not have any more money. *See* N.T., 7/28/98, pp. 46. The as-

sailant also ordered a customer in the bank not to look at him. *See* N.T., 7/28/98, pp. 61.

As the intruder was removing the currency from Ms. Messina's teller drawer, he commanded another teller, David Kerstein, who was working the drive-through station of the bank, not to touch his cash drawer. *See* N.T., 7/28/98, pp. 64. Mr. Kerstein complied with the assailant's command. After retrieving the money, the intruder then jumped back over the customer service counter and ran out the front door, taking with him a total of $8,241.00. The assailant did not physically touch any customer or bank employee nor did he display a weapon of any kind.

As soon as the intruder exited the building, Mr. Kerstein ran through the kitchen area of the bank and out the back door where he observed the assailant fleeing the scene. Mr. Kerstein witnessed the intruder running toward the Meadowood Apartment Complex and entering a green sport utility vehicle in which he drove away. As he was walking back toward the bank, Mr. Kerstein discovered a black hat in the parking lot, which he secured and turned over to the authorities shortly after they arrived.

Officer John O'Donnell of the Warminster Township Police Department responded to the call regarding the Willow Grove Bank in the Warminster Shopping Center. Officer O'Donnell arrived at the scene at approximately 10:21 a.m. on December 19, 1997. Officer O'Donnell surveyed the scene of the crime and filed a summary report of the incident.

Mr. Kerstein showed Officer O'Donnell where he had discovered the black ski mask in back of the bank in the parking lot. Officer O'Donnell also observed a pair of latex rubber gloves in back of the bank and in the area surrounding the Meadowood Apartment Complex. Officer Michel Baxter of the Warminster Township Police Department assisted Officer O'Donnell in the investigation. Officer Baxter secured the black ski mask and latex rubber gloves. Detective Scott Selisker processed the customer service counter located inside the bank. Detective Selisker dusted for prints and lifted shoe tread prints off the customer service counter in the bank.

On January 22, 1998, Sergeant Michael Mosiniak, of the Warminster Police Department and other law enforcement personnel went to 1327 Howell Street in Philadelphia, Pennsylvania, to interview Chana Williford and Holli Martin for information about Matthew Lawley, a possible suspect in the December 19, 1997 Warminster bank robbery. Ms. Williford and her father, who lived in Texas, were the cosigners for the lease of the apartment at 1327 Howell Street. Ms. Williford had taken on several roommates, including [Appellant], who had for a time shared Ms. Martin's room in the apartment.

Sergeant Mosiniak told both Ms. Martin and Ms. Williford that he was aware that [Appellant] lived at 1327 Howell Street at some point and that they were friends with him. Along with the request to interview them, Sergeant Mosiniak specifically asked Ms. Williford if she would consent to a search of the premises. Sergeant Mosiniak prepared a Consent to Search document which Ms. Williford signed.[1] Ms. Williford gave Sergeant Mosiniak consent to look around or search anywhere in the premises. Ms. Williford directed Sergeant Mosiniak to the garage on the ground floor in the back of the building underneath the apartment. The garage assigned to Apartment 1327 contained a large sofa and a mattress leaning up against it in the corner of the garage. It also contained several trash bags, some dark in color and some clear. Sergeant Mosiniak searched various trash bags and retrieved numerous items.

Sergeant Mosiniak took into custody a green book bag, a pair of black lowtop

Reebok shoes, size 11 and a black peacoat. All were recovered from the trash bags in the garage of 1327 Howell Street. All items were secured as evidence and taken back to the Warminster Police Department.

---

[1] The bait money was marked as such by the paper clip that held it together and was placed in tellers' cash drawers to act as a trigger for an alarm if this money was removed. The bait money actually covered a mechanism which would set off a silent alarm to the bank security company upon removal.

Trial Court Opinion dated 1/21/99 at 1–3.

¶ 3 At the time of the search of the premises at 1327 Howell Street, Appellant was already incarcerated in the Bucks County Correctional Facility on a criminal charge unrelated to the bank robbery. The day after the police conducted this search, January 23, 1998, they filed a criminal complaint against the Appellant for the bank robbery. Prior to the commencement of his jury trial, Appellant filed a motion to suppress evidence obtained during the search. A suppression hearing was conducted before the Honorable David W. Heckler of the Court of Common Pleas of Bucks County. The suppression hearing was limited to the issue of whether the coat and the sneakers recovered in the search should be suppressed.

¶ 4 After hearing testimony from Ms. Williford, Officer Mosiniak and the Appellant, Judge Heckler denied the suppression motion. Appellant proceeded to a jury trial and was convicted of the aforementioned offenses. He was sentenced to fourteen (14) to thirty (30) months in a state correction facility. After Appellant filed a motion to reconsider, the Trial Court entered an order allowing Appellant to serve his sentence in the Bucks County Prison. This timely appeal followed.

¶ 5 On appeal to our Court Appellant presents two issues for our consideration:

A. WAS IT ERROR FOR THE TRIAL COURT TO DENY APPELLANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE?

B. WAS THE EVIDENCE PRESENTED AT TRIAL SUFFICIENT TO SUPPORT THE VERDICT AS TO ROBBERY UNDER 18 Pa.C.S.A. § 3701(1)(a)(iv)?

Appellant's Brief at 4.

¶ 6 We have stated, in prior cases, our standard of review for the denial of a suppression motion as follows:

When we review the ruling of a suppression court, we must determine whether its factual findings are supported by the record. Where the [appellant] challenges an adverse ruling of the suppression court, we will consider only the evidence for the prosecution and whatever evidence for the defense which is uncontradicted on the record as a whole; if there is support on the record, we are bound by the facts as found by the suppression court, and we may reverse that court only if the legal conclusions drawn from those facts are erroneous.

*Commonwealth v. Roman*, 714 A.2d 440, 442 (Pa.Super.1998), *appeal denied* 1998 Pa Lexis 2297, 556 Pa. 707, 729 A.2d 1128 (1998); *Commonwealth v. Perry*, 710 A.2d 1183, 1184 (Pa.Super.1998). Moreover, as factfinder, it is within the suppression court's sole province to pass on the credibility of witnesses and the weight to be accorded their testimony. *Commonwealth v. Benton*, 440 Pa.Super. 441, 655 A.2d 1030, 1032 (1995). The factfinder is free to believe all, some, or none of the evidence presented. *Id.*

¶ 7 However, where the factual determinations made by the suppression court are not supported by the evidence, we may reject those findings. *Commonwealth v. Burnside*, 425 Pa.Super. 425, 625 A.2d 678, 680 (1993). Only factual findings which are supported by the record are binding upon this court. *Id.* Likewise, if the suppression court misapplies the law, we are also required to reverse the suppression court's determination. *Common-*

*wealth v. Queen*, 536 Pa. 315, 318, 639 A.2d 443, 445 (1994). Because Appellant has challenged the Trial Court's suppression ruling under Article I, Section 8 of the Pennsylvania Constitution, we will conduct our analysis accordingly.

¶ 8 Article I, Section 8 of the Pennsylvania Constitution provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const., Article I, § 8. Like the fourth amendment, this provision has been interpreted as protecting "those zones where one has a reasonable expectation of privacy." *Commonwealth v. Kean*, 382 Pa.Super. 587, 556 A.2d 374, 378 (1989), *appeal denied* 525 Pa. 596, 575 A.2d 563 (1990) quoting *Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (1979), cert. denied, 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980).

¶ 9 According to our Supreme Court, a proper analysis that police violated a defendant's rights under Article I, Section 8, by conducting a warrantless search, is focused on two areas of inquiry:

> 1.) Did the defendant exhibit a subjective expectation of privacy in the place searched? and
>
> 2.) Is the defendant's expectation one that society is prepared to recognize as reasonable and legitimate?

*Commonwealth v. Gordon*, 546 Pa. 65, 71, 683 A.2d 253, 256 (1996); *Commonwealth v. Peterson*, 535 Pa. 492, 496–497, 636 A.2d 615, 617 (1993).

¶ 10 The Trial Court found that during the course of Appellant's stay at the apartment, his living arrangements were "communal in nature." Trial Court Opinion at 8, 11. Specifically the Trial Court noted:

> At first, [Appellant] resided in Ms. Williford's bedroom, but at some point in November of 1997 [Appellant] moved from Ms. Williford's bedroom to Ms. Martin's bedroom. Ms. Martin and [Appellant] slept on separate mattresses thrown on the floor. There was no dresser or other piece of furniture holding clothing in the Martin bedroom. [Appellant] stored his possessions in transparent plastic bags placed on the floor in the vicinity of his mattress. There was a closet in the Martin bedroom, but Ms. Martin had exclusive use of it. Clothing to be laundered was kept in a community hamper located in the closet off the living room. The clothing would be laundered communally by one or another of the residents who happened to volunteer. Appellant did have use of the living room closet for some of his possessions. It was not uncommon to find different pieces of each occupant's clothing in the living room of the apartment.

Trial Court Opinion at 8. Thus, it is apparent that even while he was living in the apartment, Appellant had no subjective expectation of privacy in his clothing as he was aware that his possessions were in plain view at all times and subject to handling by his roommates.

¶ 11 Importantly, when the Appellant spoke with Ms. Williford on the phone on January 18, 1998, he knew that Ms. Williford would be placing his belongings in bags. N.T. Suppression Hearing, 7/27/98, at 30. He did not, however, explicitly request that Ms. Williford place the bagged belongings in a specific area or hold them inside of the apartment. In fact, he gave her no definite instructions whatsoever with respect to the designation of a particular area in which he wanted his clothes stored. Consequently, by taking this laissez-faire approach to the storage of his clothing the Appellant assumed the risk that Ms. Williford would store them in a place of her choosing. This supports the Trial Court's conclusion that Appellant had

no subjective expectation of privacy in the ultimate storage area for his clothing.

¶ 12 Moreover, Appellant could have had no objectively reasonable expectation of privacy for his clothing once it was stored in trash bags in the garage. As the Trial Court noted, the garage was accessible by all fellow tenants of his apartment and the tenants of the adjoining apartment. N.T. Suppression Hearing, 7/27/98, 17–18, 60. Hence because of this open access, and the method of exposed storage, in unsecured and unmarked bags, Appellant could have no objectively reasonable expectation that the bags would remain undisturbed. Therefore, the Trial Court's conclusion that Appellant had no objective expectation of privacy in the belongings was correct as well.

¶ 13 The Appellant has cited the case of *Commonwealth v. Storck*, 442 Pa. 197, 275 A.2d 362 (1971) as support for his argument that Ms. Williford's consent to search the garage could not extend to a search of the plastic bags in the garage which were containers for the personal property of the Appellant. However, we do not deem *Storck* to be controlling because of the important difference in the factual circumstances underlying that case.

¶ 14 In *Storck*, the defendant informed the owner of a boat, berthed in Hawaii, that he desired to purchase the boat and was returning to the United States to obtain money to purchase it. The defendant then stored in a room on the boat two suitcases, three or four boxes and a duffel bag. The defendant was later taken into police custody in Honolulu and extradited back to Bucks County Pennsylvania to face pending criminal charges.

¶ 15 Pennsylvania police officers were subsequently dispatched to Hawaii where they talked to the owner of the boat. They informed the owner of the boat that they had a right to the items stored in the room. The boat owner then allowed the officers to take possession of the suitcases, boxes and duffel bag. The police later opened the items and removed evidence, which they sought to use against the defendant at trial. The defendant moved to suppress and the trial court granted the suppression motion.

¶ 16 The Pennsylvania Supreme Court upheld the suppression and ruled that the boat owner could not consent to have the boxes opened. The possession of the items, the Court reasoned was insufficient to give the boat owner consent to open the containers or use them for his own purposes. The Court likened the possession of the items by the boat owner to be analogous to a bailment situation similar to that of a bank which rents boxes in a safety deposit vault for the storage of its customer's valuables. The Court ruled that, as a consequence, the boat owner could not consent to the search by the police and effectively waive the defendant's constitutional right to be secure in his personal effects. *Id.* at 200, 275 A.2d at 364.

¶ 17 What differentiates the case at bar from *Storck* is both the location of the stored items and the circumstances under which they were stored. In *Storck* the items were stored inside a room on the boat which is not an open area easily accessible by a variety of people like the garage in the instant case. Hence, it is reasonable to conclude that the defendant had both a subjective and objective expectation of privacy in the stored goods. The room on the boat was a private area accessible only at the discretion of the boat owner. The garage by contrast in our case was accessible at any time to a number of people in both Ms. Williford's apartment and the neighboring apartment.

¶ 18 The accessibility of the items to others has been viewed previously by our Court as a critical factor in determining whether a reasonable expectation of privacy in the items exists. For example, in the case of *Commonwealth v. Perdue*, 387 Pa.Super. 473, 564 A.2d 489 (1989), *appeal denied* 524 Pa. 627, 574 A.2d 68 (1990) the pastor of a church had been removed by

the church trustees and his living accommodations at the church parsonage were soon to be terminated. After the church was severely vandalized, a police investigator came to the church premises and recovered evidence implicating the pastor in the vandalism from a garbage bag located in a can under the parsonage porch. Evidence was also discovered and retrieved from inside the parsonage during a warrantless search, including items contained within a filing cabinet. The trial court refused to suppress this evidence.

¶ 19 Our Court upheld the trial court's decision not to suppress the evidence. We noted: "In determining what is [a] reasonable [expectation of privacy] all surrounding facts and circumstances must be considered." *Id.* at 494, quoting *Commonwealth v. Latshaw*, 481 Pa. 298, 306, 392 A.2d 1301, 1305, *cert. denied,* 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979). We held that there was no objectively reasonable expectation of privacy with respect to the garbage bag in the can because it was located in an area with public access and hence open to public inspection. *Id.* 564 A.2d at 493. We also held that there was no reasonable expectation of privacy with respect to the items in the parsonage and the filing cabinet since the pastor had reason to believe that because he would no longer be living in the parsonage he could expect that church trustees would be entering at some time to inspect the premises. *Id.* at 494. We additionally held that the trustees had sufficient dominion and control over the premises to allow opening of the filing cabinet. *Id.* Thus *Perdue* can be read for the proposition that an individual does not have a reasonable expectation of privacy in items if they are placed in an area that is subject to open access and inspection by others at any time. In the instant case, the Appellant's items were in just such an area, the garage, which was accessible and open to other tenants at any time.

¶ 20 Moreover it would seem that the boat owner in *Storck* agreed either explicitly or implicitly to store the items for an indeterminate length of time, thereby creating a bailor/bailee relationship between the boat owner and the defendant. In the case at bar Ms. Williford, the apartment owner, did not agree to hold the items in a manner consistent with the establishment of a bailment. As our Supreme Court has said:

A bailment is a delivery of personalty for the accomplishment of some purpose upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, otherwise dealt with according to his directions or kept until he reclaims it.

*Price v. Brown*, 545 Pa. 216, 221, 680 A.2d 1149, 1151 citing *Smalich v. Westfall*, 440 Pa. 409, 413, 269 A.2d 476, 480 (1970). No contract existed between Ms. Williford and Appellant for the storage of his clothes.

¶ 21 When she spoke to Appellant on the phone, Ms. Williford indicated that Appellant was no longer welcome in the apartment and his items were to be removed from the apartment as soon as possible. She did not agree to store the items for an indeterminate length of time. Her promise to store the items until Appellant sent someone by to pick them up was purely gratuitous. There was therefore no implicit or explicit contract of bailment, as her promise to hold Appellant's clothing was not based on any consideration given by Appellant. *See e.g. Geisinger Clinic v. DiCuccio*, 414 Pa.Super. 85, 606 A.2d 509, 512 (1992), *appeal denied* 536 Pa. 625, 637 A.2d 285 (No contract exists in the absence of mutuality of obligation). By contrast, in *Storck*, the boat owners agreement to store the items could be viewed as a contract of bailment since the owner's consideration for the holding of the items was the defendant's promise that he would return to purchase the boat.

¶ 22 In sum then, as the Trial Court reasoned, since Appellant had neither a

subjective nor objective expectation of privacy in the method and area of storage of his clothing, Appellant consequently assumed the risk that Ms. Williford as a rent-paying tenant of the apartment could consent to a search of the apartment and its environs. As a tenant she had the proper legal authority over the premises to give such a consent. *See Commonwealth v. McCullum*, 529 Pa. 117, 133, 602 A.2d 313, 321 (1992) (tenant who paid rent for apartment could validly give consent for search of apartment at which defendant was also staying). Therefore we perceive no error in the decision of the distinguished Judge Lawler in refusing to suppress the evidence obtained in the search of the bags.

¶ 23 We turn now to Appellant's second issue. Appellant has challenged the sufficiency of the evidence supporting his conviction for robbery under 18 Pa. C.S.A. § 3701(a)(1)(iv). We have said in prior cases:

> In evaluating a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt.

*Commonwealth v. Montini*, 712 A.2d 761, 767 (Pa.Super.1998); *Commonwealth v. Swann*, 431 Pa.Super. 125, 635 A.2d 1103, 1105 (1994), *appeal denied* 538 Pa. 669, 649 A.2d 671 (1994). In making this determination, we must evaluate the entire trial record and consider all the evidence actually received. *Commonwealth v. Rodriquez*, 449 Pa.Super. 319, 673 A.2d 962, 965 (1996). It is within the province of the fact finder to determine the weight to be accorded each witness's testimony and to believe all, part, or none of the evidence introduced at trial. *Commonwealth v. Molinaro*, 429 Pa.Super. 29, 631 A.2d 1040, 1042 (1993). The facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence, but the question of any doubt is for the trier of fact unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. *Commonwealth v. Seibert*, 424 Pa.Super. 242, 622 A.2d 361, 363 (1993), *appeal denied* 537 Pa. 631, 642 A.2d 485 (1994) (citing *Commonwealth v. Sullivan*, 472 Pa. 129, 150, 371 A.2d 468, 478 (1977) and *Commonwealth v. Libonati*, 346 Pa. 504, 508, 31 A.2d 95, 97 (1943)).

¶ 24 "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Swerdlow*, 431 Pa.Super. 453, 636 A.2d 1173, 1176 (1994) (citing *Commonwealth v. Hardcastle*, 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988)). The Superior Court may not reweigh the evidence and substitute our judgment for that of the factfinder. *Commonwealth v. Cassidy*, 447 Pa.Super. 192, 668 A.2d 1143, 1144 (1995), *appeal denied* 545 Pa. 660, 681 A.2d 176 (1996). It is also a fundamental rule of law that a jury may believe any, all or none of the party's evidence. *Commonwealth v. Henry*, 524 Pa. 135, 148, 569 A.2d 929, 939 (1990) *cert. denied*, 499 U.S. 931, 111 S.Ct. 1338, 113 L.Ed.2d 269 (1991).

¶ 25 The elements of the offense of robbery are set forth in the Crimes Code of Pennsylvania as follows:

(A) OFFENSE DEFINED.—

(1) A person is guilty of robbery if, in the course of committing a theft, he:

(i) inflicts serious bodily injury upon another;

(ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;

(iii) commits or threatens immediately to commit any felony of the first or second degree;

(iv) inflicts bodily injury upon another or threatens another with or intentional-

ly puts him in fear of immediate bodily injury; or

(v) physically takes or removes property from the person of another by force however slight.

(2) An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or in flight after the attempt or commission.

(B) GRADING.—Robbery under subsection (a)(1)(iv) is a felony of the second degree; robbery under subsection (a)(1)(v) is a felony of the third degree; otherwise, it is a felony of the first degree.

18 Pa.C.S.A. § 3701 (emphasis supplied). Thus, under this statute, for a robbery to constitute a felony of the second degree, the Commonwealth must show that in the course of committing a theft, the defendant either inflicted bodily injury on another, threatened bodily injury to another, or intentionally placed another in fear of immediate serious bodily injury. *Commonwealth v. Bowen*, 417 Pa.Super. 340, 612 A.2d 512, 514 (1992), *appeal denied*, 533 Pa. 629, 621 A.2d 577 (1993).

¶ 26 After a thorough review of the record, the briefs of the parties, the applicable law, and the very well-reasoned opinion of the Trial Court, we are satisfied that the opinion of the learned and eminent Trial Judge, the Honorable David W. Heckler, fully and correctly addresses this issue and we see no need to duplicate his fine efforts. Accordingly, we affirm on the basis of that opinion with respect to this issue.[1]

¶ 27 Judgment of Sentence affirmed.

¶ 28 President Judge McEWEN concurs in the result.

---

1. The Trial Court's recitation of the evidence supporting Appellant's conviction for robbery can be found at pages 4–7 of its opinion. Its legal rationale in support of finding this evidence sufficient to sustain Appellant's conviction can be found at pages 12–14 of its opinion.