COMMONWEALTH of Pennsylvania,
Appellee,

v.

Daniel FOSTER, Appellant.

Commonwealth of Pennsylvania,
Appellee,

v.

Anne Marie Foster, Appellant.

Superior Court of Pennsylvania.

Argued Sept. 12, 2000.

Filed Nov. 16, 2000.

Arthur Jarrett, Philadelphia, for appellants.

· Michael Gehrig, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before DEL SOLE, HUDOCK and STEVENS, JJ.

HUDOCK, J.:

¶ 1 Daniel and Anne Marie Foster appeal from the judgment of sentence imposed after a jury convicted them of endangering the welfare of a child and criminal conspiracy.[1] We affirm.

¶ 2 The trial court summarized the pertinent facts as follows:

Michael Bonetti, an Intake Social Worker with the Department of Human Services who investigates allegations of abuse and neglect, received an anonymous telephone call regarding Daniel and Anne Marie Foster on May 7, 1997. During this telephone call, Mr. Bonetti was informed that the [Fosters'] son, Patrick, had a lump protruding from his stomach, was not eating and was not feeling well. As a result of this information, Mr. Bonetti proceeded to the Foster residence, located at 6033 Frankford Avenue, in Philadelphia. Upon his arrival, Mr. Foster brought two-year old Patrick downstairs for the social worker to see. Patrick appeared lethargic, was wincing, and appeared to be in pain.

Mr. Bonetti then inquired of the Fosters whether or not the child had received any medical attention. Bonetti testified that the [Fosters] had indicated to him that they were not going to seek any medical care for the child because of their religious beliefs. Bonetti then advised the [Fosters] to seek immediate medical treatment for Patrick, at which time the Fosters reiterated that they would not secure medical care because of their religious beliefs. The social worker spent the remainder of that day in consultation with his supervisors for the purpose of acquiring and serving a restraining order upon the Fosters so as to obtain the medical care and treatment

for Patrick, which appeared to be required. The next day, May 8, 1997, Mr. Bonetti, along with others, returned to the Foster home only to be told that the parents were going to rely on God to heal their son, Patrick.

Ms. Elaine Tennesen, a Department of Human Services Child Protective Social Worker, accompanied Mr. Bonetti to the Foster residence and, on May 8, 1997, assisted him in serving the restraining order upon [the Fosters] and taking Patrick to seek required medical treatment. Ms. Tennesen testified that, when she first saw Patrick, the child was dressed in pajamas, with a blanket over him. He had cloth diapers underneath his head and was lying on his left side with his eyes opened a little bit. The boy did not look well; he was moaning and wincing. When Ms. Tennesen picked him up, mucous was coming out of his mouth, Patrick had a visible rash along his left cheek, his eye was swollen shut, his left hand was swollen and his hair was matted to the side of his head.

At this point, Ms. Tennesen agreed with Mr. Bonetti to take Patrick immediately to the hospital. Along with two police officers who accompanied the social workers to the Foster residence, Patrick was escorted to St. Christopher's Hospital, in Philadelphia, a ten-minute ride. Although the child whimpered en route, Patrick did not say anything.

Police Officer Pelszynski, Badge No. 1783, Northeast Detective Division, testified that, when she entered the Foster residence with the social workers, she saw a child on the couch and touched him to see if he was breathing. Officer Pelszynski turned, looked at the DHS workers and said "let's go." Immediately thereafter, she escorted the social workers along with the child to St. Christopher's Hospital. Upon observing Patrick, Officer Pelszynski noted the

---

1. 18 Pa.C.S.A. §§ 4304 and 903, respectively.

child to be unresponsive, gray, showing no movement, with a black and blue eye and a fresh bruise. Upon arrival at the hospital, Officer Pelszynski called the Sex Crimes Unit because she believed that there was criminal activity or some kind of abuse involved. However, no arrests were made by Officer Pelszynski on May 8, 1997.

Dr. Edwin Crews Douglas, the Director of the Oncology Department at St. Christopher's Hospital for Children, an expert in pediatric oncology, specifically kidney cancer in children, testified that upon admission to the hospital, Patrick had a stage 4 Wilm's tumor, a type of kidney cancer usually found in children, and that the cancer had spread from the kidney and was growing into other parts of Patrick's body, specifically the lungs and liver but, most importantly, the tumor had grown up onto the child's heart. Dr. Douglas' observations caused him to opine that "Patrick had the most extensive Wilm's tumor of any child I have ever seen, in terms of the size of the original tumor and also the extent of its growth up into the heart."

Dr. Douglas treated Patrick from his admission to St. Christopher's Hospital in May, 1997, through the child's hospitalization until Patrick's eventual release from the hospital in October, 1997. Dr. Douglas first saw Patrick in the Emergency Room on May 8, 1997, at which time the child presented as very lethargic, arousable, but really didn't move or respond normally, Patrick just laid there, uncomfortably, possibly in pain. He was not moving much, was grimacing, but didn't look comfortable.

Physical examination showed that Patrick had a very large tumor mass in the belly, which protruded red, inflamed and scaly. He had a rash on his arm and face, like a diaper rash or a dermatitis. When admitted, Patrick was in critical condition, approaching death.

Patrick was afterward admitted into the Intensive Care Unit and spent the next month there receiving chemotherapy to shrink the tumor. After another three weeks to a month in the general hospital population, Patrick was finally discharged, but still receiving chemotherapy on a regular basis during that time period.

Later, in October, 1997, Patrick would undergo surgery to remove the tumor from in and around the area of the heart. A long recuperative period ensued after the surgery. Patrick was hospitalized during the recuperation for approximately two months. During this recuperative period, Patrick also received radiation therapy as part of the standard treatment for the Wilm's tumor.

Dr. Douglas went on to testify that presently Patrick is doing well, with follow-up care consisting of x-rays every few months because of the chance that the tumor could return. The doctor recommended continued routine follow-up for Patrick and that the boy should receive normal medical care any child may require. However, Dr. Douglas noted a twenty percent (20%) chance of possible relapse within the first two years for Patrick.

Additionally, the doctor testified that he consulted the Fosters throughout Patrick's hospitalization(s) and course of treatment, requesting parental permission for the various procedures administered throughout the course of treatment. Dr. Douglas related that [the Fosters] always said no when specifically asked whether they would give their consent to treat their son. To the best of Dr. Douglas' knowledge, [the Fosters] did not consent to any medical treatment, and all tests performed and treatment administered were pursuant to a Court Order. Finally, the doctor opined that he did not believe that Patrick would have lived longer than another twenty-four (24) hours had not the boy received the treatment he did on May 8, 1997.

Police Officer Cheryl Monzo, Badge No. 2552, of the Sex Crimes Unit, testified next. When she asked Mr. Foster about his son Patrick's medical condition, [Mr. Foster] replied "[I can tell you] 'very little. We trust in God for all our healings. Apparently, I don't know anything as far as what he has.'" Mr. Foster stated that he was against Patrick getting medical treatment "'because it's not in God's plan.'" He knew his son was ill, but he didn't believe his son would die. Mr. Foster believed God would raise Patrick up and restore him to perfect health.

Mrs. Foster, when interviewed by Officer Monzo, stated as to her knowledge of Patrick's medical condition—"'All I know is that he has a lump protruding from his side. He's real thin. I don't know what else to say.'" When asked if Patrick had ever been examined by a doctor, Mrs. Foster's response was "'Patrick's never been examined by a doctor because parents don't believe in medical treatment, but rather believe in Divine healing. The Lord will heal us.'" Neither Mr. or Mrs. Foster wavered in their convictions as they related them to Officer Monzo during the early hours and days of their son's hospitalization. Again, no arrests were made of [the Fosters] immediately upon completion of Officer Monzo's interviews of [them] as Officer Monzo simply was "unsure that a crime had been committed."

Finally, Police Officer Crystal Williams, Badge No. 9417, of the Sex Crimes Special Investigations Unit, testified that she obtained two arrest warrants after consultation with her supervisors and authorities in the District Attorney's Office. Officer Williams was assigned the Foster case shortly after May 8, 1997 and she obtained arrest warrants for [the Fosters] by May 19, 199[7]. Upon notification of the outstanding warrants, the Fosters, along with their lawyers, surrendered themselves to the police.

Trial Court Opinion, 1/18/00, at 2–7 (references to notes of testimony omitted).

¶ 3 In their defense, the Fosters called William Wisdom, who testified as an expert witness regarding the religious practices of the church to which they belonged, the Faith Tabernacle Church. He explained that members of the church follow the Bible literally and that, following a passage in the Bible, church members do not seek medical care for illnesses but, rather, pray over and anoint the sick. Kenneth Yeager, pastor at the Fosters' church, testified that, in March of 1997, Daniel Foster called him and told him that Patrick was ill, and asked Pastor Yeager to pray for him, and also asked the pastor to request that the congregation pray for Patrick. He stated that, in the last week of April, Daniel Foster asked him to anoint Patrick, and that he did so.

¶ 4 Daniel Foster took the stand and admitted that he knew that he had a legal obligation to provide medical care for a dying child. He also admitted that, during the two weeks prior to Patrick's being rushed to the hospital, Patrick's appetite "diminished greatly" and "it was obvious, he was sick, very sick." N.T., 5/8/98, at 122–23. Daniel Foster also admitted that, if Patrick developed the same life-threatening condition again, his "stand would be the same," that is, that he would not seek medical treatment for him, but would "trust in God for his healing, any healing." *Id.* at 130–31.[2]

¶ 5 After hearing the above evidence, the jury convicted Mr. and Mrs. Foster of both charges. On September 24, 1998, Mr. and Mrs. Foster each were sentenced to seven years probation. This appeal followed.

---

**2.** By stipulation of the parties, the court identified members of the Faith Tabernacle Church in the courtroom and asked them to stand. The court then informed the jury that if called to the witness stand, each person would testify as to the Fosters' reputation in the community.

¶ 6 The Fosters now raise the following issues on appeal:

1. Did the Lower Court err in denying [their] motion to dismiss on grounds that the appropriate statutory scheme for addressing issues when parents choose prayer over medical intervention due to their legitimately held religious beliefs is the Child Protective Services Act, Title 23 Pa. C.S.A. § 6303, et seq [sic] over Title 18 Pa.C.S.A. § 4304?

2. Was the verdict based on insufficient evidence of Endangering the Welfare of Children where there was no testimony that [the Fosters'] intended the resulting harm?

3. Was the verdict of the jury against the weight of the evidence presented at trial?

4. Did the Lower Court err in instructing the jury on issues of Constitutional propriety of the actions taken by [the Fosters], thereby clouding the issues necessary for conviction of the charges before them, by directing them away from the requirement of intent?

The Fosters' Briefs at 9. We will address the issues in the order presented.

¶ 7 The Fosters first claim that that portion of the Child Protection Services Law, which exempts from the definition of "child abuse" situations where medical services are withheld to a child due to a caregiver's seriously held religious beliefs, precludes their convictions under the criminal statutes. *See* 23 Pa.C.S.A. § 6303. A similar argument has been recently rejected by this Court in *Commonwealth v. Nixon*, 718 A.2d 311 (Pa.Super.1998), *allowance of appeal granted*, 560 Pa. 723, 745 A.2d 1220 (1999).

¶ 8 In *Nixon*, the Nixons were also members of the Faith Tabernacle Church. Their daughter Shannon, described as a "mature minor", began to feel ill in June 1997 and was taken by her parents to be anointed at the church. Prayers were offered for her recovery. Although she initially felt better, Shannon later fell into a coma and died, hours later, from the onset of diabetes. Shannon's parents were convicted of involuntary manslaughter and endangering the welfare of a child. They were sentenced to an aggregate term of two and one-half to five years incarceration. In rejecting a similar argument put forth by the Nixons, this Court stated:

> We find that [Child Protective Services Law] and the involuntary manslaughter statutes are not in conflict in their plain meaning, as well as under a constitutional analysis. A plain reading of the statutes shows that an act which does not qualify as child abuse may still be done in a manner which causes death and thus qualifies as involuntary manslaughter. This precise situation occurred in this case. While the Nixons were not considered child abusers for treating their children through spiritual healing, when their otherwise lawful course of conduct led to a child's death, they were guilty of involuntary manslaughter.

*Nixon*, 718 A.2d at 314. In short, while the Child Protection Services Law exempts spiritual healing from being called "child abuse", the statute provides no consequences for a caregiver that, for whatever or no reason, fails to provide medical care for his or her dying child. Rather, the penal statutes of this Commonwealth treat the consequences of that failure to act. Thus, as in *Nixon*, when the Fosters' "course of conduct" led to the near death of Patrick, they were guilty of endangering his welfare. *See also Commonwealth v. Barnhart*, 345 Pa.Super. 10, 497 A.2d 616 (1985) (upholding voluntary manslaughter and endangering the welfare of a child convictions where two-year-old son of Faith Tabernacle Church members died from complications of a Wilm's tumor).

¶ 9 The Fosters next challenge the sufficiency of the evidence supporting their convictions for endangering the welfare of a child. That penal statute provides, in pertinent part:

(a) **Offense defined.**—A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection, or support.

18 Pa.C.S.A. § 4304(a). When reviewing a challenge to the sufficiency of the evidence, we must determine "whether, viewing all the evidence admitted at trial, together with all reasonable inferences therefrom, in the light most favorable to the Commonwealth [as verdict-winner], the trier of fact could have found that each element of the offenses charged was supported by evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt." *Commonwealth v. Jackson*, 506 Pa. 469, 472–73, 485 A.2d 1102, 1103 (1984). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Hardcastle*, 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988). "Moreover, it is the province of the trier of fact to pass upon the credibility of witnesses and the weight to be accorded the evidence produced. The factfinder is free to believe all, part or none of the evidence." *Commonwealth v. Tate*, 485 Pa. 180, 182, 401 A.2d 353, 354 (1979). The facts and circumstances established by the Commonwealth "need not be absolutely incompatible with [a] defendant's innocence, but the question of any doubt is for the [trier of fact] unless the evidence 'be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.'" *Commonwealth v. Sullivan*, 472 Pa. 129, 150, 371 A.2d 468, 478 (1977) (quoting *Commonwealth v. Libonati*, 346 Pa. 504, 508, 31 A.2d 95, 97 (1943)).

█ ¶ 10 The Fosters claim that the Commonwealth did not prove that they acted with the specific intent required under the endangering the welfare of a child statute. We cannot agree. Endangering the welfare of a child is a specific intent offense enacted in broad terms so as to safeguard the welfare and security of children. *Commonwealth v. Fewell*, 439 Pa.Super. 541, 556–58, 654 A.2d 1109, 1117 (1995). To be convicted under this statute, the Commonwealth must prove a "knowing violation of a duty of care." *Id.* (quoting *Commonwealth v. Cardwell*, 357 Pa.Super. 38, 41–43, 515 A.2d 311, 313 (1986)). This Court has held that the evidence is sufficient to prove the intent element of the offense when the accused: (1) is aware of his or her duty to protect the child; (2) is aware that the child is in circumstances that threaten the child's physical or psychological welfare; and (3) has either failed to act or has taken actions so lame and meager that such actions cannot reasonably be expected to be effective to protect the child's physical or psychological welfare. *Cardwell*, 515 A.2d at 315.

█ ¶ 11 The Fosters conceded awareness of their duty to protect Patrick and that Patrick was in circumstances that threatened his physical welfare. Their sole argument with regard to the sufficiency of the evidence is that the Commonwealth failed to prove that they either failed to act or acted in such a "lame and meager" manner that their actions could not have been expected to protect Patrick's physical welfare. Stated differently, the Fosters contend that they did indeed act, in that they prayed for their son and had him anointed, and that these acts cannot be labeled "lame and meager." As the Commonwealth correctly notes, regardless of the label attached to the Fosters' course of conduct, their failure to seek medical care constituted a breach of their duties as parents. The law imposes an affirmative duty on parents to seek medical help when the life of a child is threatened, regardless, and in fact despite, their religious beliefs. As this Court stated in *Barnhart*, 497 A.2d at 621, every parent in this Commonwealth has a duty of care to their child, at the very least, "to avert the child's untimely

death." So too in *Nixon*, 718 A.2d at 313, this Court held that the parents had "a duty to their minor child ... to override her own religious beliefs and obtain medical treatment for her when her condition became life-threatening." Thus, we conclude the record supports the conclusion that sufficient evidence of intent was produced by the Commonwealth to support the Fosters' endangering the welfare of a child convictions.

¶ 12 The Fosters next claim that their convictions are against the weight of the evidence presented. The Pennsylvania Supreme Court has recently set forth the proper considerations for considering a challenge to the weight of the evidence.

A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, [sic] concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence[,] do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

*Commonwealth v. Widmer*, 560 Pa. 308, 319–20, 744 A.2d 745, 751–52 (2000) (citations, quotation marks, and footnote omitted). Stated another way, a court may award a new trial because the verdict is against the weight of the evidence only when the verdict rendered is so contrary to the evidence received as to shock one's sense of justice such that right must be given another opportunity to prevail. *Commonwealth v. Goodwine*, 692 A.2d 233, 236 (Pa.Super.1997). Moreover, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence. *Widmer*, 560 Pa. at 321, 744 A.2d at 753. When reviewing the trial court's determination, we give the gravest deference to the findings of the court below. We review the court's actions for an abuse of discretion. *Id.*

¶ 13 In addressing this claim the trial court concluded that:

The evidence clearly showed that the Fosters knew that Patrick was ill and that they were aware of their duty to protect the child. Patrick's parents were aware that he was experiencing circumstances that threatened the child's physical and psychological welfare. Finally, it is clear from the testimony of the social workers, the police and medical personnel involved that the Fosters' failure to act or actions taken were "so lame or meager that such actions cannot reasonably be expected to be effective to protect the child's physical or psychological welfare." The evidence showed beyond a reasonable doubt that [the Fosters] together knowingly endangered the welfare of their child, Patrick, by violating a duty of care, protection or support.

Trial Court Opinion, 1/18/00, at 14 (citations omitted). We can discern no abuse of discretion. Although the Fosters once again argue that the Commonwealth failed to prove that they did not sincerely hold their religious beliefs, the sincerity of those beliefs simply was not relevant to the conclusion that their failure to seek medical attention for Patrick under the circumstances presented to them constituted a breach of their parental duty of care.

*Barnhart, supra, Nixon, supra. See also Commonwealth v. Cottam,* 420 Pa.Super. 311, 335–37, 616 A.2d 988, 1000 (1992) (holding that "[t]he validity and sincerity of the religious beliefs of [the parents] were not relevant to the issues presented.... [T]hey had no choice but to seek help, despite their religious beliefs, when they were faced with a condition which threatened their child's life.")

¶ 14 In their final issue, the Fosters assert that:

> The trial court erred when it charged the jury, at the completion of the evidence, because the trial judge discussed issues concerning religious freedom and balance between constitutional rights and child protection. The court went further, in a step-by-step analysis, as to why religion could never negate a parent's responsibility to obtain medical care for a child. Finally, the court expressed a sincere opinion that the laws of the State and country prohibited the very conduct of [them] and likened their behavior to child abuse. The court negated any explanation, or reason for the behavior by the [Fosters], as meaningless in a society that will not tolerate child abuse. In making these statements, which were entirely unrelated to the jury instructions for the substantive crimes charged and were unrelated to the weight/sufficiency of the evidence, the trial court gave the impression that the statements, themselves, had the full force and effect of law.

The Fosters' Brief at 46. The trial court found this claim by the Fosters to be "patently absurd." Trial Court Opinion, 1/18/00, at 14. The court wrote:

> The jury's focus on specific intent necessary to convict the [Fosters] was not affected. Analysis of First Amendment Constitutional principles was not tantamount to a directed verdict of guilty, nor will this Court insult the intelligence of the jury and say that the charge in any way confused them. The [Fosters] were

> not prejudiced nor were any fundamental legal principles misstated, including those concepts of establishment and exercise embodied in the First Amendment's Constitutional protection of religion ... Much care, thought and time was spent in crafting this charge, which states the law of this Commonwealth as it exists today. Even had the Court dismantled the [Fosters'] theory of religious defense, which it in no way attempted to do, that fact alone does not invalidate the charge as given. *Barnhart,* [497 A.2d at 627].

Trial Court Opinion, 1/18/00, at 14–15.

¶ 15 Initially, we note that no objection was taken to this portion of the court's jury instructions. Thus, the claim is waived. *See generally, Commonwealth v. Betz,* 444 Pa.Super. 607, 664 A.2d 600 (1995). Nevertheless, we agree that this claim is meritless. When reviewing a trial court's instructions, error will not be found based upon isolated excerpts; rather, a reviewing court must consider the instructions as a whole in order to determine whether the charge accurately and clearly conveyed the applicable law to the jury. *Commonwealth v. Soto,* 693 A.2d 226, 230 (Pa.Super.1997). A trial court has discretion in phrasing its instructions to the jury; there are no "magic, talismanic words which must be uttered in order for a charge to pass muster." *Id.* When reviewed in its entirety, we find no error in the jury charge. The comments to which the Fosters object regarding the interplay between the religious freedom and the protection of the child are similar to the "strongly worded" instructions found proper in *Barnhart. Barnhart,* 497 A.2d at 626 n. 10. Thus, we reject the Fosters' final claim of error.[3]

¶ 16 Judgments of sentence affirmed.

---

3. The Fosters refer to two affidavits attached

to their briefs and purportedly signed by ju-

rors from their trial, which "shed some light on the confusion jurors had on the role of intent of the defendant in a specific intent crime." The Fosters' Brief at 52. As these affidavits are not part of the certified record, they cannot be considered. *Commonwealth v. Nixon*, 311 Pa.Super. 450, 454–56, 457 A.2d 972, 975 (1983). At any rate, these affidavits do not profess any confusion caused by the trial court's charge.