**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| CHRISTOPHER ROSS HECKER, | |
| Appellant | No. 2093 MDA 2015 |

Appeal from the Judgment of Sentence July 10, 2015
In the Court of Common Pleas of Centre County
Criminal Division at No(s): CP-14-CR-0001253-2014

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED DECEMBER 28, 2016**

Christopher Ross Hecker ("Appellant") appeals from the judgment of sentence entered in the Court of Common Pleas of Centre County after a jury convicted him on eleven counts of Terroristic Threats, eleven counts of Harassment, and one count of Stalking[1] in connection with a series of emails and phone calls he placed to his ex-wife at her home and office.  Sentenced to twelve to twenty-four years' incarceration, to be followed by four years' probation, Appellant contends the court improperly directed a verdict when it instructed the jury that it could consider his state of mind with respect to the element of intent but could not discern an insanity or mental instability defense to the crimes charged because Appellant failed to assert such defenses during trial.  We affirm.

---

[1] 18 Pa.C.S.A. §§ 2706(a)(3), 2709(a)(4), and 2709.1(a)(2), respectively.

*Former Justice specially assigned to the Superior Court.

On May 29, 2014, Appellant contacted his ex-wife ("Complainant") for the first time after their three-year marriage ended in divorce seventeen years earlier, in 1997. In his three-page email, he expressed a desire to reunite with her and asked numerous questions about her and her family,[2] saying he had viewed their pictures of Facebook. N.T., 4/27/15, at 64. He also insinuated that Complainant was part of a technology-based surveillance society involved in harassing him, and he asked her to explain why this surveillance was ongoing. Complainant construed this latter aspect of the email as unfriendly and threatening, and she chose not to respond to the unwelcome correspondence. N.T. at 60, 63.

On June 1, 2014, Appellant sent two more emails to Complainant within the span of one hour reiterating his desire for reunification and pleading for her to respond, even if to say that she desired no further contact from him. N.T. at 67. After some contemplation, Complainant acted on Appellant's invitation and replied, in the hope that he would desist once and for all, that she was not interested in resuming any form of relationship with him. *Id*. Twenty minutes later, Appellant sent a reply email asking for her forgiveness because he was subjected to very cruel and abusive torment by others, and he wished her "nothing but the best." N.T. at 68. Complainant felt a sense of relief from this response, until three minutes later, when Appellant sent her another email warning her "Don't ever do it

---

[2] Complainant had re-married, and she and her husband have two children, who were ages nine and seven at the time in question. N.T. at 59-60.

again." N.T. at 68. Complainant was then convinced that Appellant was "going to keep coming at me." *Id*.

Forty-five minutes later, Complainant's suspicions were confirmed when Appellant sent another email stating his belief that she was lying and he will always love her, before his message devolved into more "inflammatory stuff about what he thinks I [Complainant] might or might not be involved with or doing or something." N.T. at 69. Six more hours elapsed when Appellant sent another email in which he began with "You're lying, [Complainant]." He announced his plan to overdose, which Complainant viewed as nothing but an attempt to gain her response. N.T. at 70. Eight minutes later, Appellant sent an email stating that others are teasing him over her and that her denial of him was a lie. He concluded this email with the assertion that "you are evil, and I can't live like this. So I need to find an overdose and kill myself and it really is that bad and you know it and you couldn't care less which is why I should . . . make you care but I can't so." N.T. at 71.

Only twenty-six minutes pass before Appellant emails Complainant again, at 11:44 p.m., to call her a liar and threaten committing suicide on her front porch. Complainant now began to feel frightened that Appellant was implying he had plans to come to her residence. *Id*. Just three minutes later, Appellant sends another email in which he says, succinctly "You're fucking evil, [Commplainant]. Simple as that. I will have revenge, wait." N.T. at 72.

The following day, as Complainant drove to her place of employment at The Pennsylvania State University, University Park campus ("Penn State"), it occurred to her that a simple Google search of her name would connect one to her office email and phone number. N.T. at 73-74. When she arrived at work, two voicemails from Appellant were awaiting her. She listened to them and walked out of her office when one of her staff said that somebody "not very nice" had been calling for her. N.T. at 75. Complainant advised the employee to stop answering the phone.

The office phone continued to ring "nonstop," and Complainant would simply end the call each time without speaking. N.T. at 75-76. Sometime later, her boss informed her that he had no choice but to call the Penn State Police Department because threatening messages of a broader scope had been placed on the main line. N.T. at 76. Investigators arrived, and during their forty minutes at the office Appellant placed approximately fifteen more phone calls threatening the lives of Complainant, her husband, her coworkers, and others. N.T. at 76, 84-99. By 5:00 p.m., all of Complainant's employees left the office as a group and hurried to their vehicles.

Complainant obtained a Protection From Abuse Order on June 5, 2014, but Appellant continued contacting her after he had been served with the order. N.T. at 102-16. Appellant warned "People are still using your image and attributes to convey abusive charades of mental abuse. It has to stop, [Complainant]. I have been getting very volatile over the last few months.

Stop this before I murder someone." N.T. at 106. He also advised "I got notice of your PFA, and I'm breaking it right now—fully knowledgeable that I am breaking it right now." Other messages included "I am coming out there as soon as possible," "I am out here-planning my strike," and "Officer Miller, you cannot stop me. The police cannot stop me. The Courts cannot stop me either."

Included among the thirty-five specific messages of violence Appellant directed at Complainant over the first week of June, 2014, were references to school massacres, such as: "This is why people show up on college campuses, [Complainant], and do horrible things . . . and [Complainant] works where? A college campus[;]" I might pass through Penn State and there might be a problem on campus, and it might go international[;]" and, "I hope lots of you get shot."

Appellant also threatened Complainant's family numerous times, including "[Complainant], I'm coming after you, and I want the truth, and I'm gonna get it no matter what it takes. How many kids do you have now, [Complainant]?" and "That three year old little girl thrown off a bridge in front of a tractor trailer; the image would be horrible. I'm going to make it worse than that."

Penn State Police investigators determined from the cell phone tower ping evident on Appellant's phone calls that he was placing his calls from the State of Oregon. N.T. at 168. This information was consistent with an address and a photograph that Appellant had included in an email he

recently sent to Complainant. N.T. at 169. Investigators contacted the Portland, Oregon Police Department and, ultimately, had Appellant extradited to Centre County, where the Penn State Police had filed a criminal complaint against him on June 14, 2014. On July 9, 2014, Appellant waived his right to a preliminary hearing and all charges were bound over to the Court of Common Pleas. A criminal information was subsequently filed on July 31, 2014, and, on August 6, 2014, Appellant was formally arraigned. Unable to make bail, Appellant served pre-trial detention at the Centre County Correctional Facility.

Represented by court-appointed counsel from the Centre County Public Defender's Office, Appellant, on March 27, 2015, filed a motion *in limine* seeking exclusions of references to alleged prior instances of misconduct, including his violation of a PFA Order and his prior criminal record. Subsequently, Appellant filed a supplemental motion *in limine* complaining that it had served it with a "selectively edited CD of [Appellant's] phone calls to [Complainant] . . . depriving the [Appellant] of the ability to correct a misleading impression as well as misleading the jury by taking the statements contained in this selectively edited CD out of context." Supplemental Motion *in Limine*, filed 3/31/15, C.R. #16.[3]

---

[3] From nearly 150 minutes of recorded voicemails left by Appellant, the Commonwealth considered eight and one-half minutes' worth sufficiently incriminating, and it placed those statements, alone, on a CD it intended to admit at trial.

The Commonwealth, meanwhile, filed a supplemental motion *in limine* of its own seeking, *inter alia*, preclusion of an insanity or mental infirmity defense given Appellant's failure to provide Pa.R.Crim.P. 579 notice of its intention to offer such a defense. Under Rule 568(B), the Commonwealth argued, the lack of such notice allowed the court to "exclude entirely any evidence offered by the defense for the purpose of proving the defense, except testimony by the defendant." Commonwealth's Supplemental Motion *in Limine*, filed 4/20/2015, at 6 (quoting Pa.R.Crim.P. 568(B)). Accordingly, the Commonwealth sought an order "barring any testimony, evidence, and/or oral argument concerning whether [Appellant] was mentally insane or suffering from mental infirmity at the time of the offense…." ***Id***.

At the hearing on the parties' supplemental motions, counsel for Appellant conceded the Commonwealth's position against the presentation of an insanity or mental instability defense, indicating that, pursuant to Appellant's direction, he would not be presenting an insanity defense. N.T. 4/23/15 at 7-8.[4] Accordingly, the court granted the Commonwealth's

---

[4] Defense counsel conceded that he was not presenting a case of insanity to the jury:

> **DEFENSE COUNSEL:** I'm not offering an insanity defense. Mr. Hecker, we disagree about what he believes in and whether or not if his beliefs are real or delusional. We can have that disagreement, but I'm not arguing to the jury, [']find him not guilty by reason of insanity.['] Mr. Hecker does not want me to do that. So, that should be granted. I'm not going to argue an insanity defense.

N.T. at 7.

motion in that regard, but it otherwise granted Appellant's motion seeking inclusion of the entire two-and-one-half hour recording of Appellant's phone statements for purposes of providing context.

Trial commenced on April 27, 2015, and, at the conclusion of evidence and just prior to charging the jury, the court reviewed proposed jury instructions with respective counsel. N.T. 4/28/15 at 299-305. Among the instructions discussed was one pertaining to the lack of an insanity or mental instability defense offered by Appellant. On this proposed charge, the court expounded as follows:

> **THE COURT:** So, based on the way the evidence came in, the Court came up with an instruction. And after some discussion, Mr. Klena, on behalf of the defendant, did add some language which the court accepted and the Commonwealth accepted and I'm just going to read that instruction into the record. If anybody wants to make an objection, they can once I find the number. Thank you for not letting me forget that.
>
> The Court was going to give this instruction. [']Defendant has not asserted an insanity defense or a defense of mental instability. Therefore, you are not to consider any evidence of insanity or mental instability as a defense to the crimes charged.['] The language that Mr. Klena wanted added would be: [']You may consider the defendant's state of mind with regard to forming intent.['] Is there any objection to the Court giving that?
>
> **DEFENSE COUNSEL:** I would object in terms of that being given at all. I understand the Court is going to give it which is why I asked that the additional language be used. But I do want for purpose of preserving the record for appeal [to] place my objection to that.
>
> I believe, again, it somewhat amounts to a directed verdict that may violate his presumption of innocence.

> **THE COURT:** I believe you offered some case law at the beginning which will be part of the record.
>
> **DEFENSE COUNSEL:** That's correct.
>
> **THE COURT:** Anything from the Commonwealth on the proposed instruction?
>
> **COMMONWEALTH:** Obviously, we believe it should go in…. Okay. Your Honor, the cases that Mr. Klena cited are **_Gearhart_** which is a DUI case in which the Court doesn't instruct the jury that it may not consider something. It instructs the jury that it must find that the DUI must be found if they find the BAC was proven at .10 or higher.
>
> Because that isn't a fact which comprises an element of the offense in that Court, the Court may never compel the inference and that comes from **_Commonwealth v. Difrancesco_**, at 329 A.2d 204, and that would in that case amount to a shifting of the burden to the defendant to thus disprove his guilt.
>
> We believe that that is clearly distinguished from this case in that we are only seeking to include a jury instruction which tells the jury the exact opposite, not that they must consider a piece of evidence that we would have been required to prove, but that there is a piece of information which was never provided to them and, therefore, they may not take that into account.
>
> **THE COURT:** The Court will overrule the defense objection and will give the instruction….

N.T. 4/28/15 at 302-05.

The court charged the jury in conformance with this discussion, incorporating the instruction at issue within an otherwise standard jury instruction on the element of intent:

> **THE COURT:** Defendant has not asserted an insanity defense or a defense of mental instability. Therefore, you are not to consider any evidence of insanity or mental instability as a defense to the crimes charged. You may consider the defendant's state of mind with regard to forming intent.

As I have told you, one of the elements of this crime is that the defendant intended a certain result. Ordinarily, it is not possible to prove intent, knowledge, or other states of mind by direct evidence unless, for example, there is evidence that the defendant made a statement concerning his state of mind.

However, intent, knowledge, and other states of mind, like any other matter, may be proved by circumstantial evidence, that is, by inferences that reasonably may be drawn from all the facts and circumstances, including the defendant's acts and conduct which have been shown by the evidence in this case. Thus, you may conclude that the defendant possessed the requisite state of mind based on circumstantial evidence alone but only if the circumstantial evidence is strong enough to convince you that the Commonwealth has established this state of mind beyond a reasonable doubt.

N.T. at 370-71.

The jury returned with a guilty verdict on all charges. After the court imposed sentence and denied Appellant's post-sentence motions, Appellant filed the present appeal.

Appellant presents one question for our consideration:

DID THE TRIAL COURT ERR IN GIVING THE JURY A DIRECTED VERDICT TELLING THE JURY IT COULD NOT FIND THE DEFENDANT NOT GUILTY BY REASON OF INSANITY?

Appellant's brief at 4.

Our standard of review of a trial court's jury instructions is as follows.

[T]his Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that [ ] a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

*Commonwealth v. Antidormi*, 84 A.3d 736, 754 (Pa.Super. 2014) (citation omitted), *appeal denied*, 95 A.3d 275 (Pa.2014). We note, further, that in a court's phrasing its instructions, there are no "magic, talismanic words which must be uttered in order for a charge to pass muster." *Commonwealth v. Foster*, 764 A.2d 1076, 1084 (Pa.Super. 2000) (citation omitted). Moreover, "[t]he law presumes that the jury will follow the instructions of the court." *Commonwealth v. Brown*, 786 A.2d 961, 971 (Pa.2001) (citation omitted), *cert denied, Brown v. Pennsylvania*, 537 U.S. 1187 (2003).

Our jurisprudence denounces any instruction that would compel a jury to presume a fact comprising an element of an alleged offense, for mandating such an inference "would amount to a shifting of the burden of producing evidence to the defendant and, in effect, a directed verdict of guilty if the accused fails to rebut. Directed verdicts of guilt in criminal cases negate the presumption of innocence and, as such, are never permissible." *Commonwealth v. Gearhart*, 384 A.2d 1321, 1323 (Pa.Super. 1978) (citing *Commonwealth v. Turner*, 317 A.2d 298 (Pa. 1974) (condemning directed verdict as "abhorrent to the criminal law.").

Here, in charging the jury that it could not identify an insanity or mental infirmity defense to the crimes where Appellant never offered such a defense, the trial court did not compel the jury to conclude that the state of mind element to the charges was, thereby, established. Indeed, the court

- 11 -

specifically informed jurors they were still to consider evidence of Appellant's state of mind and how such evidence bore upon his ability to form requisite intent. Only if the Commonwealth met its burden of producing circumstantial evidence establishing the state of mind element beyond a reasonable doubt, the instruction concluded, could the jury convict Appellant of the charges.

As a whole, therefore, the instruction never directed a verdict as to the element of intent. Instead, it charged the jury to assess the circumstantial evidence presented at trial and determine whether the Commonwealth established, beyond a reasonable doubt, that Appellant had formed the requisite state of mind. Because we view the instruction as representing a fair and appropriate expression of both applicable law and the evidence presented at trial, we discern no reversible error committed below.

Judgment of sentence is AFFIRMED.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/28/2016