Commonwealth *v.* Jackson, Appellant.

470

Argued May 23, 1949. Before MAXEY, C. J., LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Albert Martin,* for appellant.

*Loran L. Lewis,* Assistant District Attorney, with him *William S. Rahauser,* District Attorney, for appellee.

OPINION BY MR. JUSTICE JONES, June 24, 1949:

The defendant was convicted of murder in the second degree upon an indictment charging her in two counts with (a) murder and (b) voluntary manslaughter. Motion for new trial was refused; judgment of sentence was entered on the verdict; and the defendant appealed. It is her contention that the evidence adduced at trial did not warrant a conviction upon either count of the indictment. A review of the relevant and material evidence is, therefore, necessary.

The indictment was founded on the alleged felonious killing of one David Williams whose death was due to shock and hemorrhage following a stab wound of the

chest. The wound was inflicted by a knife during a scuffle between Williams and the defendant, Lillie Belle Jackson, around 2 A.M. Monday, January 12, 1948, in a "speak-easy" in a back room of the first floor of premises at 43 Logan Street, Pittsburgh. Ben Jones, an uncle of the defendant, was the lessee of the entire first floor; he sublet the back room to Walter Rhodes who operated the "speak-easy". The front room opened on the street and was used by Jones for a restaurant. The defendant, a negress, worked as a waitress in her uncle's restaurant over weekends but was employed, during the week, in an industrial plant. She was twenty-five years old at the time of the occurrences herein related. Williams was a stoutly built negro, about thirty-five years old, five feet seven inches tall and weighing approximately one hundred and eighty-five pounds. He had served as bartender in the "speak-easy".

On the preceding afternoon (Sunday), Williams had taken money out of the restaurant cash register and had departed about 5 P.M., saying that he was going to leave town because of a "liquor charge" against him which was to come up the following day. The defendant left the restaurant between 6 and 7 P.M. but returned about 10 P.M. When Jones, who had been absent from the restaurant, heard of the purloining of the money, he and the defendant started out in search of Williams and finally located him in a gambling game in the locality. Jones entered the gambling place, leaving the defendant outside, and there accosted Williams concerning the money. After some discussion, Jones persuaded Williams to accompany him back to the restaurant where they went around 2 A.M., the defendant preceding them on the return. The defendant went into the restaurant and thence into the "speak-easy". Jones and Williams delayed outside for a few minutes; the money matter between them having apparently been settled to their mutual satisfaction by Williams' promise to give

Jones, next day, a check or checks which he expected to receive from the government, they entered the restaurant, Williams going on back to the "speak-easy", while Jones remained in the front part of the restaurant.

Shortly thereafter, one Glover, who also worked in the restaurant and who was there at the time, overheard some words between Williams and the defendant in the "speak-easy", Williams saying, "What you got to do with it?" Glover next heard a scuffle; and, in a few minutes, the defendant re-entered the restaurant and left by the front door, passing Ben Jones on the way out without saying anything. Williams followed soon after, went outside and was found a little later on the sidewalk, a block and a half away, bleeding from the chest wound already mentioned. He was dead upon arrival at a hospital a short while afterwards. The defendant walked the streets of Pittsburgh the remainder of that day and the ensuing night, without sleep, giving herself up to the police the following day (January 13th) after having seen in a Pittsburgh newspaper that Williams was dead.

The only witnesses to the material circumstances leading up to and attending the infliction of the mortal wound were the decedent and the defendant. And, it is solely upon two statements (one oral, the other written) which the defendant voluntarily gave the police on the day of her surrender that the Commonwealth endeavors to sustain the jury's verdict. Such evidence appears in the Commonwealth's case in the testimony of Lt. Connors of the homicide division of the Pittsburgh police who was corroborated in part by two other officers of the division, namely Sgt. Born and Detective Jennings. With respect to the oral statement made by the defendant, Lt. Connors testified that "She stated that Williams had taken some money from the cash register and she, together with her Uncle Ben Jones, had found Williams and got back to the restaurant and got back in the

kitchen and an argument ensued. He slapped her and she stabbed him. . . . I then asked her where he had hit her and she stated that he struck her in her face with his fist and I asked her if there were any marks or bruises on her face and she stated there wasn't. . . . Shortly after that [perhaps a half hour or so] there was a [written] statement taken from this defendant."

The written statement was in question and answer form, Lt. Connors asking the questions and the defendant answering them. It was taken stenographically by Sgt. Born and, after being transcribed, was read by the defendant who signed it and swore to it. Upon Lt. Connors' identification of the written statement, as an exhibit at trial, it was received in evidence without objection. The material part of the statement is as follows: "Q. Now, you just go ahead Lillie Belle and just tell us how this trouble first started, what it was about and everything connected with the death of this man David Williams? A. It was around 1 A.M., and David Williams was in the restaurant and he had taken some money from my Uncle Ben Jones, Ben and I had been looking for him before he came in to locate the money, David came in the restaurant and my Uncle Ben was out front, David said to me, that he was going to take all the money in the cash register, and skip town as he had a liquor charge that was coming up today, I told him that he couldn't take the money that it was in my charge and I wouldn't let him have it. He attempted to go in the cash register and remove the money that was in the cash register. I ran and grabbed him and pulled him away from the cash register, I fell, I mean he hit me and I fell, when I got up he was in the cash register, I run toward him and we got to scuffling and David reached up where the cash register is and got a knife, during the scuffle that's when he got cut, but I can [sic] explain how he got cut. After I saw him bleeding I walked out the door and never saw him no

more. . . . Q. You say this man Williams struck you and knocked you down? A. That's right. Q. Where did he hit you? A. On the jaw. Q. There are no marks on your jaw? A. He hit me with his fist. . . . Q. Now you have understood the questions that I have asked you and the answers that you have given are the truth and you are satisfied that we use this statement in court in the trial of this case? A. Yes, you can use it. Q. Can you read and write? A. Yes. Q. I. will ask you to read this statement and if it is true and correct are you willing to sign it? A. O.K." The police officers then accepted the defendant's signature to the appended certification that she had "read the foregoing statement and [found] it to be true and correct" to which she was also sworn.

The foregoing quoted portions of the record constitute the sum and substance of the relevant evidence offered by the Commonwealth concerning the commission of the alleged crime. Plainly enough, it fell far short of tending to prove beyond a reasonable doubt the defendant's guilt of the crimes charged in the indictment. Indeed, if the evidence be accredited (and the Commonwealth offered it as being credible), it establishes that the defendant acted justifiably in the circumstances in self defense and was not, therefore, guilty of any crime. If, however, the evidence be rejected, there is nothing left in the case but uncertain suspicion. A finding of the defendant's guilt based thereon would amount to no more than an arbitrary guess. From the one sentence in Lt. Connors' narration of the defendant's oral statement to the effect that "He [Williams] slapped her [the defendant] and she stabbed him", the district attorney argues that the defendant attacked Williams feloniously and with malice. The oral statement did not warrant any such sweeping conclusion. At most, it was but the witness' verbal recitation of his recollection of what the defendant had orally stated. Its probative

effect was not of such definite import as to render it capable of impeaching or overcoming the more formal written statement taken practically contemporaneously. Throughout the written statement, there is not the slightest suggestion from the interrogating officer that the defendant's answers conflicted with anything she had first stated orally or that her responses were not true. The fact is that the three police officers present at the interrogation solemnly witnessed the defendant's certification and her oath that her answers were the truth. The shadowy inference which the district attorney draws from the one sentence in the defendant's recounted oral statement was far from sufficient to establish her guilt of the crimes charged beyond a reasonable doubt. Because of the insufficiency of the evidence as a matter of law, the conviction cannot stand.

The judgment and sentence is reversed.