J-S32006-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA

        v.

ADRIENE WILLIAMS

        Appellant

:
:
:
:
:
:
:
:
:
:
:
:

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1323 WDA 2020

Appeal from the PCRA Order Entered November 30, 2020
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0009769-2015

BEFORE:  LAZARUS, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY LAZARUS, J.:        **FILED: FEBRUARY 25, 2022**

Adriene Williams appeals from the order, entered in the Court of Common Pleas of Allegheny County, dismissing her petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.  Upon careful review, we affirm.

The trial court set forth the facts of this case as follows:

Between 4:00 p.m. and 5:00 p.m., [Williams] dropped off her three-year-old daughter, [A.W.], at [Williams]'s mother's house. [Williams]'s mother, Lucille Williams, routinely watched [A.W.] while [Williams] was at work.  [Williams] was a security guard. She had arrived at her mother's house wearing casual clothing and she changed into her security guard uniform at her mother's house.  While at Lucille Williams' house, [A.W.] asked to eat some watermelon.   [Williams] went to the kitchen to get some watermelon for her daughter.  After a few minutes, Lucille Williams went to the restroom.  Family members noticed [A.W.] run from one room toward the front door of the residence to give [Williams] a kiss before she left for work.  When Lucille Williams came out of the bathroom, [Williams] was gone.  Lucille Williams believed that [Williams] had left for work.  [A.W.] was also missing

from the residence. The last anyone saw of [A.W.] was when she left one room of the residence and ran toward the front door to give her mother a kiss. Lucille Williams and two other occupants of the residence began looking around the residence for [A.W.] without success. The family members frantically attempted to call and send text messages to [Williams] to inquire if she knew anything about [A.W.]'s location. [Williams] did not answer her phone or respond to any text messages for approximately ten to fifteen minutes. When [Williams] finally responded to the efforts to reach her, [Williams] claimed that [A.W.] was not with her and she did not know [A.W.]'s location. Additional calls and text messages to [Williams] went unreturned for approximately 30 minutes. [Williams] then returned to Lucille Williams' residence. [Williams] changed clothes and began to look for her daughter.

At approximately 7:50 p.m., about an hour after [A.W.] went missing, [A.W.]'s body was discovered by someone walking her dog about three miles from Lucille Williams' residence. [A.W.]'s body was found lying on the side of a dirt pile strewn with rocks, road debris and downed trees. Bright, multi-colored paper clips were found near [A.W.]'s body. Emergency personnel were summoned to the scene and [A.W.] was confirmed dead. Trial testimony indicated that [A.W.] had died from asphyxiation. She had redness and abrasions above her right eye and forehead area.

A police investigation ensued. Upon being questioned about her whereabouts at the time [A.W.] went missing, [Williams] advised detectives that she was at work. She acknowledged that she responded via a text message that [A.W.] was not with her. She explained that by the time she had made contact with her family, she was driving in her car, on her way to her mother's residence to help find [A.W.]. When she returned to her mother's house, [Williams'] shoes were mud-covered. [Williams'] car was searched and bright, multi-colored paper clips were found in the car. The paper clips were of the same type (size and color) that were found at the location where [A.W.'s] body was found. Also found was a notebook in which [Williams] complained of the difficulties of single-parenting. [Williams'] work shirt was recovered from her vehicle and there was a stain on the shoulder area of the shirt. That shirt was sent to the Allegheny County Crime Lab for analysis. Results of testing revealed that the stain on the work shirt was from watermelon.

Cell phone tower data was admitted at trial. The evidence showed that at the time [Williams] claimed she was at work, her cell phone

'pinged' a cell phone tower located in an area near where [A.W.]'s body was found. Furthermore, surveillance videos of the area where [A.W.]'s body was found disclosed that a vehicle fitting the description of [Williams'] vehicle traveled near, and generally in the direction of, the area where [A.W.]'s body was found.

Trial Court Opinion, 11/29/17, at 2-4.

Additionally, Allegheny County Deputy Medical Examiner Abdulrezak Shakir, M.D., testified that he observed numerous contusions and abrasions—all evidence of trauma—on A.W.'s body. *See* N.T. Trial, 535-36. He also observed petechial hemorrhages—or burst blood vessels—in A.W.'s eyes, a type of injury that is seen "in cases of increased intravascular pressure in the head, and that can be upon sequence of compression of the body or can be upon sequence of compression of any situation which result in increase of the subcranial pressure." *Id.* at 537-38. Doctor Shakir testified that A.W.'s toxicology report was negative and that there was no evidence of an external injury sufficient to cause her death. *Id.* at 538. Doctor Shakir concluded that the cause of death was asphyxiation, and the manner of death was homicide. *Id.* at 539, 541.

Following a jury trial, on August 26, 2016, Williams was convicted of third-degree murder, abuse of corpse, and tampering with or fabricating physical evidence. On January 17, 2017, the trial court sentenced her to 20 to 40 years' incarceration for third-degree murder, with no further penalty imposed as to the remaining counts. Post-sentence motions were denied and, on February 3, 2017, Williams filed a timely notice of appeal to this Court. Williams filed a court-ordered Pa.R.A.P. 1925(b) concise statement of errors

complained of on appeal, in which she raised, *inter alia*, a claim challenging the sufficiency of the evidence supporting her third-degree murder conviction. In the counseled appellate brief filed on Williams' behalf, however, this claim was abandoned.

On December 28, 2018, this Court affirmed Williams' judgment of sentence. **See Commonwealth v. Williams**, 220 WDA 2017 (Pa. Super. filed Dec. 28, 2018) (unpublished memorandum decision). Our Supreme Court denied allowance of appeal on January 28, 2020.[1] **See Commonwealth v. Williams**, 223 A.3d 676 (Pa. 2020) (Table).

Williams filed a *pro se* PCRA petition on June 29, 2020. The PCRA court appointed current counsel, Corrie Woods, Esquire, who filed an amended petition on October 20, 2020. In the amended petition, Attorney Woods alleged that "[p]rior counsel did not challenge the sufficiency of the evidence to support a finding of malice, and, thus, Williams' conviction for third-degree murder." Amended PCRA Petition, 10/28/20, at ¶ 17. Because Williams' sufficiency claim had arguable merit, Attorney Woods argued that prior counsel was ineffective for failing to pursue the issue on direct appeal. **See id.** at ¶¶ 21-26.

On November 3, 2020, the PCRA court issued a Pa.R.Crim.P. 907 notice of its intent to dismiss Williams' PCRA petition without a hearing. Williams

---

[1] After prior counsel failed to file a petition for allowance of appeal with the Supreme Court, Williams' right to do so was reinstated, *nunc pro tunc*, following PCRA proceedings. **See** PCRA Court Order, 8/27/19.

filed a response on November 23, 2020, and the court issued an order dismissing the petition on November 30, 2020. Williams filed a timely notice of appeal, followed by a court-ordered Rule 1925(b) statement. On appeal, Williams raises the following claim:

> Did the PCRA court err in dismissing Williams' claim that prior counsel were ineffective in failing to challenge her conviction for third-degree murder as unsupported by evidence of malice where it depends upon purported expert testimony that people do not asphyxiate accidentally and other evidence that is equally consistent with Williams' innocence as it is her guilt?

Brief of Appellant, at 4.

It is well-settled that, in reviewing the denial of PCRA relief, "we examine whether the PCRA court's determination is supported by the record and free of legal error." **Commonwealth v. Fears**, 86 A.3d 795, 803 (Pa. 2014) (quotations and citations omitted).

To be entitled to PCRA relief, a petitioner bears the burden of establishing, by a preponderance of the evidence, that her conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S.A. § 9543(a)(2), which include a violation of the Pennsylvania or United States Constitution or ineffectiveness of counsel, any one of which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." **Id.** at § 9543(a)(2)(i) and (ii). Counsel is presumed effective, and in order to overcome that presumption, a PCRA petitioner must plead and prove that: (1) the legal claim underlying the ineffectiveness claim has arguable merit; (2) counsel's action or inaction

- 5 -

lacked any reasonable basis designed to effectuate petitioner's interest; and (3) counsel's action or inaction resulted in prejudice to petitioner. ***Commonwealth v. Fletcher***, 986 A.2d 759, 772 (Pa. 2009); ***Commonwealth v. Natividad***, 938 A.2d 310, 321 (Pa. 2007). To demonstrate prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's actions or inactions, the result of the proceeding would have been different. ***See Strickland v. Washington***, 466 U.S. 668, 694 (1984); ***Commonwealth v. Tedford***, 960 A.2d 1, 12 (Pa. 2008). Failure to establish any prong of the ***Strickland*** test will defeat an ineffectiveness claim. ***Commonwealth v. Walker***, 36 A.3d 1, 7 (Pa. 2011).

Here, Williams asserts that direct appellate counsel were ineffective for failing to pursue a claim that the evidence was insufficient to support her conviction for third-degree murder, where the Commonwealth's evidence establishing malice depended upon "purported expert testimony that people do not asphyxiate accidentally" and other evidence that is equally consistent with Williams' innocence. Brief of Appellant, at 4. Specifically, Williams claims that the testimony of Dr. Shakir was "patently and obviously false," in that it purportedly limited the ways in which a person can be asphyxiated to strangulation, smothering, or being held so tightly that they cannot breathe. ***Id.*** at 26. Williams argues that

> people, and especially small children, asphyxiate by accidental choking and suffocation each and every day. Indeed, **it is common knowledge that people, and especially small children, face risks of accidental asphyxiation ranging from the mundane to the exotic every day, including but not**

- 6 -

> **limited to, most salient here, choking on food or foreign objects**.

*Id.* (emphasis added).

Williams argues that there was evidence that A.W. was, in fact, exposed to two possible choking hazards in the period of time immediately preceding her death: First, A.W. consumed watermelon—which contains seeds—prior to following Williams outside as she left for work. Second, multicolored paperclips were found both in Williams' car and on the ground under and near A.W.'s body, which also could have posed a choking hazard to the child. Williams argues:

> This is not to say that this evidence affirmatively established that A.W. asphyxiated by accident, but merely illustrates how [Dr.] Shakir's testimony **that a person can only asphyxiate by forcible means** failed to account for the patent and obvious possibility of an accident, and, thus, could not properly be received by a jury.

Brief of Appellant, at 29 (emphasis added).

In its brief, the Commonwealth argues that Williams' claim on appeal is properly framed as one of ineffectiveness based on counsel's failure to raise a challenge to the weight of the evidence, rather than its sufficiency—a claim she failed to raise in her amended petition. The Commonwealth asserts that Williams "acknowledges that her challenge to the evidence is actually 'qualitative,' i.e., a challenge to the weight of the evidence." Brief of Appellee, at 16. Thus, because an issue is waived where a petitioner fails to raise it in her PCRA petition, and because the trial court addressed only her sufficiency

claim as a result, Williams has waived her appellate claim. *Id.* at 17. Moreover, even if not waived, the Commonwealth asserts that Williams' underlying sufficiency claim is meritless and, thus, direct appeal counsel cannot be deemed ineffective for failing to pursue the challenge.

Williams asserts that her underlying claim is not one of weight, but properly framed as one of "qualitative sufficiency," meaning that "where evidence is patently and obviously false to all reasonable persons, it may not be credited by a jury." Brief of Appellant, at 22. Such a challenge may be considered under the rubric of sufficiency, and "evidence that is contrary to incontrovertible physical facts, human experience, or the laws of nature" must be rejected. *Id.* at 21, citing **Commonwealth v. Santana**, 333 A.2d 876, 878 (Pa. 1975) (holding testimony should have been rejected by jury where refuted by "undisputed physical facts"). Similarly, a conviction may not stand where the evidence is in equipoise, i.e., "equally consistent with a defendant's innocence as her guilt." Brief of Appellant, at 21, citing **Commonwealth v. Woong Knee New**, 47 A.2d 450 (Pa. 1946). While we agree that, under **Santana** and **Woong Knee New**, Williams' claim may be considered one implicating sufficiency, we nevertheless conclude that she is entitled to no relief.

The standard and scope of our review of a sufficiency claim is well-established:

> The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence

to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Ventura*, 975 A.2d 1128, 1142 (Pa. Super. 2009) (cleaned up).

"In addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes." *Commonwealth v. Strafford*, 194 A.3d 168, 175 (Pa. Super. 2018). "Evidence of identification need not be positive and certain to sustain a conviction." *Id.* (citation omitted). Furthermore, "[d]irect evidence of identity is, of course, not necessary and a defendant may be convicted solely on circumstantial evidence." *Id.* (citation omitted).

As noted above, the Commonwealth, as verdict winner, is entitled to the benefit of all reasonable inferences which could be drawn from the evidence it presented at trial.

Critically, however, our Court has also long made an exception to this principle of appellate deference in recognition of the fact that,

in some cases, the entire body of evidence introduced at trial which furnished the basis for an appellant's conviction is so deficient that it does not reasonably support a finding of guilt beyond a reasonable doubt, as a matter of law. **See, e.g.**, **Commonwealth v. Jackson**, [] 66 A.2d 841, 843 ([Pa.] 1949) ("Because of the insufficiency of the evidence as a matter of law, the conviction cannot stand.").

Thus, in those atypical situations, our Court has consistently held that we are not bound by the factual findings and credibility determinations rendered by the finder of fact, and we are compelled in such circumstances to reverse a legally erroneous conviction. **See Commonwealth v. Libonati**, [] 31 A.2d 95, 97 ([Pa.] 1946) (holding that question of whether the trial evidence established guilt beyond a reasonable doubt is for the finder of fact "unless the evidence 'be so weak and inconclusive that as matter of law no probability of fact can be drawn from the combined circumstances[,]'" []quoting **Commonwealth v. Du Boise**, [] 112 A. 461, 463 ([Pa.] 1921)[]; [**Commonwealth v.**] **Bausewine**, 46 A.2d [491,] 493 [(Pa.1946)] ("[I]t must be remembered that guilt must be proved and not conjectured. The reasonable inference of guilt must be based on facts and conditions proved; it cannot rest solely on suspicion or surmise. These do not take the place of testimony.").

*Id.* at 408-09.

Williams challenges the sufficiency of the evidence underpinning her conviction for third-degree murder. To establish the offense of third-degree murder, the Commonwealth must prove the killing of an individual with malice. **Commonwealth v. Knox**, 219 A.3d 186, 195 (Pa. Super. 2019); **Commonwealth v. Marquez**, 980 A.2d 145, 148 (Pa. Super. 2009) (en banc). "Malice" includes not only particular ill-will toward the victim, but also wickedness of disposition, hardness of heart, wantonness, cruelty, recklessness of consequences, and conscious disregard of an unjustified and extremely high risk that the defendant's actions may cause serious bodily

harm. ***Commonwealth v. Young***, 431 A.2d 230, 232 (Pa. 1981); ***Commonwealth v. Patterson***, 180 A.3d 1217, 1230 (Pa. Super. 2018); ***Commonwealth v. Devine***, 26 A.3d 1139, 1146 (Pa. Super. 2011). In short, third-degree murder "is an intentional act, characterized by malice, that results in death, intended or not." ***Commonwealth v. Fisher***, 80 A.3d 1186, 1191 (Pa. 2013).

Here, Williams bases her argument, in substantial part, on her contention that Dr. Shakir's testimony regarding the cause and manner of death "may not be credited" as it is "patently and obviously false." Brief of Appellant, at 22, 26. Doctor Shakir testified, in relevant part, as follows:

> Q. In this case, Doctor Shakir, were you able to formulate an opinion as to the cause of the death of Adrionna Williams?
>
> A. Yes.
>
> Q. What was your opinion?
>
> A. My opinion is that she died as a result of asphyxia, the obstruction of the supply of oxygen to the various organs of the body. Oxygen is an essential gas which we need in the performing of our vital functions, a function that we usually get through our respiration. Any obstruction of respiration would result in depletion of the oxygen supply, and that results in interfering with the function of the brain and heart and other vital organs that result in death.
>
> Q. **What are the ways in which a person can be asphyxiated?**
>
> A. **The person can be asphyxiated through obstruction of the airway. That is what we call sometimes a smothering, which is covering of the mouth and nose forcibly. Or through compression of the body by exerting pressure on the chest of the individual to prevent the expansion of the chest that we need in cases of respiration.**

- 11 -

Q. Is manual strangulation a type of asphyxiation?

A. Yes.

Q. Do you have any evidence of manual strangulation?

A. In this situation, I don't have any evidence of manual strangulation.

. . .

Q. In this particular case, were you able to come to a conclusion with regard to the manner of death?

A. Yes.

Q. What was your conclusion in that regard?

A. In that regard, the conclusion is homicide.

Q. Could you tell the jury what factors you considered in this particular case that led you to the conclusion that the case was homicide?

A. Yes. Here we have a young girl, three years and 11 months, who was healthy, with no complaints, when she was left at her grandmother's house at 6:15 p.m., the same day that her body was found.

Then she was reported missing. Then within an hour and 34 minutes, her lifeless body was found discarded in a wooded area. This type of circumstance is indicated a homicide in this situation.

Q. Was your opinion in that regard influenced by the fact that [A.W.] was found without shoes?

A. In a way—[t]here is another matter, which is the place where she was found is about over two miles from the place where she was left an hour and 34 minutes earlier. And she could not, by herself, walk to that place. Her feet did not show any evidence of dirt or any incident of trauma, indicating that she did not walk all this distance, and at the same time, due to her age, I would not expect her to be able to walk that distance in a matter of one hour and 34 minutes.

Q. Could you explain for the jury how you came to the cause of death as asphyxia in this case?

A. In this situation, we have this young child with no history of trauma, no history of disease. She was noted an hour and 34 minutes earlier with no complaint, and no indication of any condition that would have caused her death. Then her lifeless body was found discarded in this wooded area. Of this short time, a complete autopsy examination showed no evidence of trauma to be cause of death.

That complete toxicology examination showed no evidence of toxins in her or drugs in her that caused the death. And in this situation, the only way that she could have died is due to asphyxia.

Q. Doctor Shakir, the opinions that you testified to today, do you hold those to a degree of medical certainty in your field?

A. Yes, sir.

N.T. Trial, 8/22/16, at 538-40, 541-43 (emphasis added).

Contrary to Williams' argument, Dr. Shakir did not, in fact, testify that "people do not asphyxiate accidentally." Brief of Appellant, at 22. Rather, Dr. Shakir was asked by counsel for the Commonwealth to explain the ways in which people can asphyxiate, and he responded by listing causes of asphyxiation. *See* N.T. Trial, 8/22/16, at 539. Doctor Shakir's testimony was not "patently false" simply because he failed to note that a person may asphyxiate accidentally. Brief of Appellant, at 26. Indeed, Dr. Shakir's list of possible causes of asphyxiation was not exhaustive, and it is certainly possible to imagine circumstances where "obstruction of the airway," N.T. Trial, 8/22/16, at 539, or "compression of the body by exerting pressure on the chest," *id.*, could occur accidentally. If Williams' theory of the case was that A.W. asphyxiated accidentally, it was defense counsel's obligation to cross-examine Dr. Shakir as to how she may have done so, and whether any

- 13 -

evidence supported that theory. For whatever reason, counsel chose not to do so. *See id.* at 543-48 (cross-examination of Dr. Shakir). Because Williams mischaracterizes Dr. Shakir's testimony, her argument that it is "in conflict with the incontrovertible physical facts and contrary to human experience and the laws of nature," Brief of Appellant, at 17, quoting *Santana*, *supra*, and therefore must be rejected must, itself, be rejected.

Williams further asserts that the remainder of the evidence presented by the Commonwealth was equally consistent with her innocence as it was with her guilt. Williams' argument is as follows:

> [T]he fact that a single mother finds her role stressful (like the vast, vast majority of single and even coupled people do) does not warrant an inference that she intends to kill her child, or, more importantly, that she engaged in any act demonstrating malice with regard to killing her child. Indeed, the fact that a single mother finds her role stressful does not make it "more likely than not" that she is going to commit a homicide.
>
> And although the remaining evidence tends to show that Williams feared detection of A.W.'s death, and thereby tends to suggest some degree [of] consciousness of guilt, the question remains: guilt of what? Assuming *arguendo* that A.W. did asphyxiate accidentally, it would have been entirely reasonable for Williams to fear prosecution for negligent homicide, or, at a minimum, child abuse and neglect in some form or another. And that ignores the virtual farrago of civil consequences that arise following a determination that one has abused or neglected a child. Indeed, even if Williams was not negligent in any manner, her fear may have owed to the knowledge that, guilty or innocent, she was about to be the prime suspect in a child homicide investigation that could, and, ultimately, did, destroy her reputation, estrange her from her family, and take away her liberty for the bulk of her remaining natural life. Or it may have owed to simple panic.

Brief of Appellant, at 30-32 (citations omitted).

We disagree with Williams' assertion that the evidence is in equipoise as to her innocence and guilt. The evidence presented at trial demonstrated that Williams was the last person to be seen with A.W., an otherwise healthy three-year-old child. Cell phone data from the relevant time period placed Williams' vehicle in the area where A.W.'s body was found, and contradicted Williams' claim to police that she had driven through the Squirrel Hill Tunnel on her way to work. In addition, video surveillance evidence placed a vehicle having the same distinctive[2] characteristics as that belonging to Williams near the scene where A.W.'s body was discovered. Moreover, after Williams' family members discovered that A.W. was missing from their residence, they attempted to contact Williams both by text and telephone call. After responding to one text in which she denied A.W. was with her, Williams failed to respond to an additional nine texts and 21 phone calls, despite being aware that her daughter was missing. Additionally, stains consistent with the contents of A.W.'s stomach were found on the shoulder of Williams' work shirt, which Williams changed out of prior to engaging in a search for her child, and which was subsequently found by police during a search of her vehicle. Finally, Dr. Shakir testified that A.W. had numerous contusions and abrasions on her body and that she died of asphyxiation.

---

[2] Williams' red Toyota Corolla had damage to the front passenger-side bumper and headlight; its windows were tinted; the rear passenger side was missing a hubcap; and there was damage to the rear passenger-side bumper. *See* N.T. Trial, 8/17/16, at 248-50.

The totality of the circumstances described above allows for an inference that Williams was responsible for A.W.'s death and that she possessed the requisite malice to establish third-degree murder. *See Commonwealth v. Truong*, 36 A.3d 592, 598 (Pa. Super. 2012) (malice may be inferred after considering totality of circumstances); *Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa. Super. 2001) (malice consists of "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty" and may be found where defendant consciously disregarded unjustified and extremely high risk that actions might cause serious bodily injury). Moreover, Williams' argument, that the behavior used by the Commonwealth to demonstrate her consciousness of guilt actually constituted an attempt by Williams to obscure the fact that A.W. asphyxiated accidentally, is nonsensical. It simply defies logic to suggest that Williams would rather obfuscate and face trial for murder than admit to a lesser offense.

In conclusion, the evidence presented by the Commonwealth, combined with all reasonable inferences derived therefrom, was sufficient to allow a jury to conclude that Williams killed A.W. with the malice required for a conviction of third-degree murder. Accordingly, the PCRA court properly concluded that direct appeal counsel cannot be deemed ineffective for abandoning Williams' sufficiency claim on appeal. *Fears*, 86 A.3d at 809 (counsel may not be deemed ineffective for failing to raise meritless claim).

Order affirmed.

Judge Musmanno did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/25/2022