J-S11044-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| JUSTIN RAY SAPP | : | |
| Appellant | : | No. 1291 WDA 2025 |

Appeal from the Judgment of Sentence Entered September 23, 2025
In the Court of Common Pleas of Fayette County Criminal Division at
No(s): CP-26-CR-0000199-2025

BEFORE: LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED: May 1, 2026**

Justin Ray Sapp appeals from the judgment of sentence, entered in the Court of Common Pleas of Fayette County, following his convictions of one count each of conspiracy—manufacture, delivery, or possession with intent to manufacture or deliver (PWID),[1] endangering welfare of children (EWOC),[2] conspiracy—possession of a controlled substance,[3] conspiracy—use or possession of drug paraphernalia,[4] and persons not to possess a firearm.[5] After review, we affirm Sapp's judgment of sentence.

_____

[1] 18 Pa.C.S.A. § 903; 35 P.S. § 780-113(a)(30).

[2] 18 Pa.C.S.A. § 4304(a)(1).

[3] 18 Pa.C.S.A. § 903; 35 P.S. § 780-113(a)(16).

[4] 18 Pa.C.S.A. § 903; 35 P.S. § 780-113(a)(32).

[5] 18 Pa.C.S.A. § 6105(a)(1).

Uniontown City Police obtained a search warrant for 138 Walnut Street, Uniontown, after executing two controlled drug purchases at that address. On October 7, 2022, Uniontown police officers executed the search warrant. At the time, Sapp, Shirl DeWitt, Sapp's girlfriend and co-conspirator, their then ten-month-old child, and two other adult individuals were present in the home. Police recovered multiple items of drug paraphernalia, various drugs, including a bag containing fentanyl, and a derringer pistol. All adult residents were subsequently charged with various offenses.

Sapp's trial was held on September 8 and 9, 2025. Uniontown City Police Department Detective Alexis Metros testified for the Commonwealth as both the arresting officer in Sapp's case and as an expert in the field of drug investigations and trafficking. *See* N.T. Jury Trial, 9/9/25, at 124-25. Detective Metros testified that Shirl responded to the police's first attempt to gain entry to the home by exiting the residence with her and Sapp's infant daughter. *Id.* at 131. Inside the residence, Detective Metros recovered a five-ounce baby bottle, which she found "in close proximity to where [] fentanyl was located." *Id.* at 146-47. The fentanyl was found in a plastic bag on the floor in the living room next to the baby bottle and a spoon with residue on it "in [a] pile of baby stuff[.]" *Id.* at 149. Detective Metros testified that

the amount recovered totaled four hundred and sixty lethal doses.[6] *Id.* at 150.

Following Detective Metros' testimony, a discussion was held between the Honorable Judge Joseph M. George, Jr., Assistant District Attorney Michelle Kelley, Esquire, Sapp's counsel, Ethan Carter, Esquire, Shirl DeWitt's counsel, Phyllis Ann Jin, Esquire, and Sandra Dewitt,[7] Shirl DeWitt's mother, who was without counsel. Because one of Sapp's claims on appeal sounds in prosecutorial misconduct, namely, that the Commonwealth improperly threatened Sandra with prosecution, we provide the discussion regarding whether she would invoke her Fifth Amendment rights in full:

> The Court: Let's start with the possible defense witness. Ma'am, what was your name?
>
> Ms. DeWitt: Sandra DeWitt.
>
> The Court: Can you speak up for me, I can't hear you.
>
> Ms. DeWitt: Sandra Dewitt.
>
> The Court: And you are the mother of the co-defendant?
>
> Ms. DeWitt: Yes.
>
> The Court: Did you live at this residence before?
>
> Ms. DeWitt: No.
>
> The Court: No. Okay. So, the Court's been advised that you are a potential defense witness, and we don't have a whole lot of information but basically the information that we have is that you

---

[6] Gabriel Llinas, a forensic scientist and the Commonwealth's expert in the field of drug identification, testified that the amount recovered was 9.2 grams of fentanyl. *Id.*, 9/8/25, at 73, 75.

[7] At the time, Sandra DeWitt was without counsel.

could potentially be called; and don't say anything until I finish. You could potentially be called as a witness for the defense to say that this firearm was yours or maybe a family member of yours then came into your possession and that you left this firearm at this residence where this search occurred where your daughter was. That's your daughter, right, who is the co—

Ms. DeWitt: Correct.

The Court: Where your daughter was and this defendant. So, what I want to make sure that you're clear on is that you know it's not like leaving some dishes or a couch or something, there's some special rules with regard to a firearm[,] especially a loaded firearm that could subject you, if you were to testify, you could potentially be admitting to committing a criminal offense, if there's individuals there who aren't permitted to have firearms or be in possession of firearms. There's a child in this location. So, I'm not saying that you're going to be charged or you're not going to be charged. I don't know the answer to that question. All I have to advise you of is that there is a risk, if you were to testify that you left this gun there loaded in this location, there is a risk of a criminal charge coming down the road against you. Now, you can certainly testify however you want. It doesn't make a difference to me. I just want to make sure that you understand there is a potential risk involved depending on what you say with regard to this firearm and essentially leaving it in this location. Do you understand?

Ms. DeWitt: I understand.

The Court: Do you want your own court[-appointed] counsel[?] We could attempt to appoint counsel for you if we could find someone or do you want to, knowing what I've told you and this risk, do you want to elect to take your [F]ifth [A]mendment right not to testify and not potentially incriminate yourself or do you want to say, hey[,] I'm willing to take the risk, I want to testify and let the chips fall where they may.

Ms. DeWitt: Could I speak with [Attorney Jin] for one—

The Court: You can but I don't know that she can advise you because she is representing your daughter and I don't know to what extent those interests might conflict or be the same so [Attorney] Jin may not be able to give you advice because she has to consider her own client's interest first and foremost. Am I correct, [Attorney] Jin, or do you feel you could talk to her?

- 4 -

Attorney Jin: No. I'd feel more comfortable if she'd talk to another attorney. I mean, if that's her choice.

Ms. DeWitt: I'm kind of torn. I mean[,] I don't know really what to do. I mean if— You have to tell the truth you know but—

The Court: But you also have the [F]ifth [A]mendment right not to incriminate yourself and that's why we're having this conversation because you could potentially be incriminating yourself depending on what you say. Again, I don't know exactly what you're going to say, I'm just telling you what I've been told as a possible witness that you may testify that you left this gun there. I mean[,] you can't just leave loaded guns around and that could subject you to, I don't know, a reckless endangering, endangering the welfare of a child, if it happened while the child was there. There could be maybe some others I'm not thinking of. I just want you to be aware that you could be admitting to some crime that you're not charged with now, but you could be in the future if you admit to it under oath.

Ms. DeWitt: All right.

The Court: Whereas you can elect to take the [F]ifth [A]mendment and not testify. Do you see what I'm saying?

Ms. DeWitt: I do.

The Court: Okay.

Ms. DeWitt: I honestly do but I also feel bad because I don't want him to have to suffer a charge of my negligence if that sounds—

The Court: Well, you never know what they're going to do. You could say whatever; you could tell us the truth, and they still might find him guilty because his DNA is on the gun. You could not testify—

Ms. DeWitt: Yeah. And I don't understand why that is so.

The Court: You could not testify, and he could be found not guilty, or he could be found guilty. We just don't know. There's a lot of unknowns here. You don't know what they're going to do depending on what you say or even what you don't say if you don't testify.

Ms. DeWitt: I don't want to have a criminal record for something that; yes, it was neglectful, but I don't want to have to have a record that I have never been in trouble for in my life.

The Court: And you may not. All I have to tell you is there is this risk.

Ms. DeWitt: Is, there's a possibility. Correct?

The Court: Because I don't know what you're going to say, and I don't know if it's going to lead to charges down the road. I just need you to be aware there's a risk when you're talking about leaving a loaded firearm behind and now it's found in this situation where there's two people who are prohibited from possessing firearms in that location and a baby. So, there's a possibility there. I could try to find counsel for you over the lunch hour and appoint counsel for you maybe to have this conversation with in a little more detail. Do you want me to try to do that?

Ms. DeWitt: Okay. That; yeah.

The Court: So, you'll be with [Attorney] Jin or with your daughter and [Attorney] Jin somewhere?

Ms. DeWitt: Yes.

The Court: I'll try to find [Attorney] Tiberi maybe. I don't think he's in trial.

Attorney Jin: No. I don't think so. I don't think anybody is in trial. I think they're just waiting for a couple continuances on my cases.

The Court: So, what are we doing with [Attorney] Jin then as far as her client?

Attorney Carter: I spoke with [Attorney] Jin, Your Honor, at this time I'm not intending to call her client[,] however I would reserve the right and I think that I need to find out what is going to happen with [] Sandra DeWitt and at this point if she is going to get counsel I need to speak with her counsel to figure out what's going to happen there before I fully decide on any particular course of action when it comes to the defense case in chief.

. . .

The Court: So, if we're able to get [Attorney] Tiberi in here at some point during the lunch hour, he could find you to find her?

- 6 -

Attorney Jin: Yes.

The Court: I'm going to text him now and see if we can get him in.

Attorney Jin: Okay.

The Court: And then let's bring them back to do cross and then we'll break until about one[-]thirty and have everybody back here and maybe we'll have some answers. So, you need that first domino before you can see about the others.

Attorney Carter: Correct. To make any final decisions.

The Court: Gotcha. So, if you guys could just wait in the hall just for a little while and I'll see if I can get an attorney up here to talk to you and if not, we'll have him touch base with you, [Attorney] Jin, to try to find you maybe over the lunch hour.

Attorney Jin: Okay.

The Court: Are we ready to bring them in for cross?

Attorney Carter: Yes, Your Honor.

*Id.* at 171-77.

The trial then recommenced with the cross-examination of Detective Metros. *Id.* at 178. After Detective Metros was excused from the stand, with all counsel present, the trial court appointed Vincent M. Tiberi, Esquire, to represent Sandra DeWitt. *Id.* at 188-89. After Attorney Tiberi spoke with Sandra DeWitt, the trial court, Attorney Carter, Attorney Tiberi, and Attorney Kelley had the following discussion:

Attorney Carter: Your Honor, after speaking with [Attorney] Tiberi, I do still intend to call [Sandra] DeWitt as a witness with the understanding that at certain points she might invoke her [F]ifth [A]mendment right.

The Court: [Attorney] Tiberi?

Attorney Tiberi: That's my understanding as well, Your Honor.

- 7 -

The Court: So, let's make it clear so I don't; I don't want to ask her something, sometimes I have a tendency to jump in maybe when I shouldn't. What are you going; where's the line? What do you want to ask her and where are you going to stop, so we're all on the same page.

Attorney Carter: Well, I believe she could still testify to whose firearm it is, who owned it, who owned the house, without incriminating herself in any way. I believe that she could testify to whether or not she ever saw my client possess that firearm because that does not implicate her either. I also think she can discuss whether it was stolen, whether she knew anyone who took it or anything like that. The line for me, and certainly [Attorney] Tiberi can opine differently, but the line for me would be the specific conduct of that day with her taking the firearm and leaving it at the house. I think that's the point at which she potentially becomes implicated and so anything prior to that or the circumstances around it, she could still testify to without any risk.

The Court: So, she's going to say her husband as the registered owner. Correct?

Attorney Carter: Yeah. I think she can even testify that her husband brought the gun to the house that day.

Attorney Kelley: Well—

The Court: How's she going to do that[?] Was she with him? Did she see it?

Attorney Carter: She was. She was with him.

The Court: So, she and the husband bring the gun to the house on the actual day of this search warrant.

Attorney Carter: Yes.

The Court: And, what, just put it on a shelf before [the police] bust through the door at six in the morning?

Attorney Carter: It was, I believe the day before, it was left there. Now, but I—

Attorney Tiberi: That's where we get into—

Attorney Carter: Yeah. To be clear, I'm not saying she can talk about how she might have taken the weapon from her husband

and put it up there. I think she can testify that her husband brought the firearm to the house. That does not implicate her.

Attorney Tiberi: I would worry about any conspiracy or what have you of a[n 18 Pa.C.S.A. § 6105] when we get to that part.

Attorney Kelley: Yes.

Attorney Tiberi: I agree with the line up to that, right before that point though, I don't have an issue with.

Attorney Kelley: And how can I not ask her—

The Court: Right. I mean—

Attorney Kelley: Like[,] don't you know that they are persons of this class that are not permitted to own, possess or control a firearm[?] How can I not ask her that[?]

The Court: You're ignoring that [Attorney Kelley] has a right to cross-examine her. You want [Sandra DeWitt] to get in everything favorable and then when it gets to a certain point, [Sandra DeWitt] says oh no, I take the [F]ifth, and [Attorney Kelley] can't cross her. How's that fair?

Attorney Carter: Well, I recognize I'm advocating for [] Sapp here so I'm trying to be as expansive on my side as possible.

The Court: I understand. That's a little too expansive though I would say.

Attorney Kelley: I'll stipulate—

The Court: We can't just say she's, you know, because---

Attorney Carter: Well, I guess---

Attorney Kelley: I just want to keep it as clean as possible.

The Court: What, Mr. Tiberi, are you— At what point are you saying [Sandra DeWitt]'s got to stop testifying? What are you— Are you advising her something different, she just wants to go this—

Attorney Tiberi: The fact that the firearm is her husband's, that's fine, what have you. Did she ever see [Sapp] with it, I'm fine with. But the, was she part of bringing it to the house the day before, that's the part that I think we go too far at.

The Court: So, the day before, just by coincidence, she comes with the husband, husband actually takes the gun and puts it on this cabinet[,] and then they leave and then the next day is the bust.

Attorney Tiberi: There was a reason to take it off; to not have it on then, they were handling the baby.

The Court: But they put it up there and then left, forgot it was up there, and left?

Attorney Tiberi: They forgot it was up there. That's my understanding. [Sandra DeWitt] did not have it on her. No.

The Court: But she's there with the husband?

Attorney Tiberi: Yes. With her husband.

The Court: And they both bring it there.

Attorney Tiberi: I'm sorry.

The Court: He's carrying it there?

Attorney Tiberi: He's carrying it.

The Court: He's the registered owner?

Attorney Tiberi: And she; yes. She tells him before he picks up the baby, hey, take that off.

The Court: What, is he wearing it like a holster?

Attorney Tiberi: What's that?

The Court: It's like a holster? When you say take it off, what do you mean?

Ms. DeWitt: In his pants, his pocket.

The Court: Just in like a waistband?

Attorney Tiberi: Yes.

The Court: And you want to elicit that prior to, the day before, she never saw [Sapp] in possession of the gun? Is that another component of this that you're asking for? Because [Sapp]'s not charged with anything prior to that, [Sapp]'s charged with on that day being in possession.

Attorney Carter:  I mean[,] I suppose I could ask, did she ever see [Sapp in possession of the gun] prior to the search.

The Court:  How's that relevant if [Sapp]'s charged with being in possession of it on this day in question[?]

Attorney Carter:  Yeah.  I still think I can ask the, well—

The Court:  Ownership is one thing, and I mean that really doesn't, at the end of the day, doesn't matter, even if she owns it or the husband owns it, it's possession, not ownership.  But if you want to get in this ownership, I don't have an issue with that.  But I think once you get into, as [Attorney] Tiberi said, if she's bringing it there and leaving it there with the husband—

Attorney Tiberi:  I think it lacks intent and other things, anything that she could testify to but I still, there's always a chance and I have to—

The Court:  Right.  Because there's other elements of recklessness, gross negligence, that type of thing.  So, you had mentioned a stipulation which may be the safest way to go.

Attorney Kelley:  I'll stipulate that the gun was registered to—

The Court:  The husband?

Attorney Kelley:  Yeah.

The Court:  And she and the husband are visiting and bring the gun to the location?

Attorney Tiberi:  They both possessed— Maybe we should approach.

*Id.* at 201-06.

At this point in the proceeding, a sidebar discussion was held off the record.  *Id.* at 206.  Back on the record, the discussion continued:

The Court:  We're going to go back on the record.  We've talked to counsel off the record.  The parties have agreed that the [c]ourt will inform the jurors of a stipulation that a [] witness for the defense named Sandra DeWitt, if called, would testify that she and her husband, Robert DeWitt, Jr., went to the residence, Robert with the gun that's registered to Robert DeWitt, Sr., his

- 11 -

father, who passed away and left it to junior[,] and then Robert[,] Jr.[,] removes the gun from his person and it[']s left there at the residence. She would also testify that, if asked, she would also testify, she does not know how [Sapp]'s DNA got on the gun. Is that a correct stipulation?

Attorney Carter: Your Honor, I believe the only amendment would be to specify that those events occurred on October 6th, 2022.

The Court: October 6th. Yes. Attorney [Kelley], does that cover everything?

Attorney Kelly: Yes, Your Honor.

The Court: [Attorney] Tiberi, does that work?

Attorney Tiberi: I believe so. Yes, Your Honor.

*Id.* at 206-07.

The trial court then provided the following stipulation to the jury:

The Court: So, the witness, Sandra DeWitt, if called by the defense, she would testify that on October 6th, 2022, the day before the incidents involving this charge arose, she would testify that she and her husband, Robert DeWitt, Jr., went to this residence in Uniontown, the residence we've been talking about on Walnut Street, that they went there with the gun in question that is registered to Robert DeWitt, Sr., Robert DeWitt, Jr.'s father who passed away and left the gun to Robert DeWitt, Jr. So, they went there with the gun to see the baby, not to see the baby with the gun but just to see the baby. Robert DeWitt, Jr.[,] then removes the gun from his person while he's visiting with the baby and leaves the gun at the residence. If asked, she would also testify she does not know how the defendant's DNA would have then got on the gun. So, that's essentially the stipulation that, if she were called, that is what she would testify to. [] Sandra DeWitt would testify in that fashion about her and Robert taking the gun there [and] leaving it there the day before. Does that cover our stipulation, [Attorney] Carter?

Attorney Carter: Yes, Your Honor. That's the correct recitation of the stipulation.

The Court: [Attorney] Kelley?

Attorney Kelley: Yes, Your Honor.

- 12 -

The Court:  [Attorney Tiberi]?

Attorney Tiberi:  No objection here.

The Court:  My backup in the back of the courtroom.  Thank you, [Attorney Tiberi].

Attorney Tiberi:  Thank you, Your Honor.

The Court:  With that, defense rests?

Attorney Carter:  That is correct, Your Honor.  We would have no further testimony.

*Id.* at 208-09.

At the close of trial, the jury convicted Sapp of the aforementioned offenses.  On September 17, 2025, the trial court sentenced Sapp to six to twelve years' incarceration on the PWID conviction, thirty to sixty months on the EWOC conviction, to run consecutively to the PWID sentence, and five to ten years on the persons not possess conviction, to run concurrently to the PWID sentence, for a total of eight-and-a-half to seventeen years' incarceration.  On September 23, 2025, the trial court amended Sapp's sentence by adding on the statutorily mandated twelve months of state re-entry supervision.  *See* 204 Pa. Code § 303.12(f)(2)(ii).

Sapp filed a post-trial motion on October 1, 2025, which the trial court denied on October 7, 2025.  Sapp then timely appealed, and both Sapp and the trial court have complied with Pa.R.A.P. 1925.  On appeal, Sapp raises two issues for our review:

> 1.  Did the Commonwealth inappropriately exercise its prosecutorial power when it raised the possibility of a defense witness incriminating herself prior to her testimony on behalf of [Sapp]?

- 13 -

2. Was the evidence present[ed] by the Commonwealth sufficient to establish the conviction for [EWOC]?

Appellant's Brief, at 3.

Sapp first claims that the Commonwealth committed prosecutorial misconduct and violated his constitutional right, under both the Pennsylvania and federal constitutions, to call witnesses to testify on his behalf by "raising the possibility that [] Sandra DeWitt might be charged herself in relation to the incident in question if she were to testify on Sapp's behalf." *Id.* at 8. While Sandra DeWitt's testimony ultimately came in in the form of a stipulation, Sapp avers that this was "eroded" testimony because it was "stripped of the full breadth of detail and information which full, sworn[] testimony might provide[,]" and because the jury was not able to "assess her credibility and truthfulness regarding her testimony, including her credibility regarding the items included in the stipulation." *Id.* at 9.

"Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion." ***Commonwealth v. Melvin***, 103 A.3d 1, 26 (Pa. Super. 2014) (citations and internal quotation omitted). "It is within the discretion of the trial court to determine whether a defendant has been prejudiced by misconduct or impropriety to the extent that a mistrial is warranted." ***Id.*** (citing ***Commonwealth v. Baez***, 720 A.2d 711, 729 (Pa. 1998)).

A defendant's Sixth Amendment right, under the federal Constitution, to call witnesses favorable to his defense mandates that such witnesses be free to testify without fear of prosecutorial retaliation. ***Commonwealth v.***

- 14 -

*Holloman*, 621 A.2d 1046, 1053 (Pa. Super. 1993) (citing *United States v. Blackwell*, 694 F.2d 1325, 1334 (D.C. Cir. 1982)). "Under certain circumstances, intimidation or threats that dissuade a potential defense witness from testifying may infringe a defendant's due process rights." *Holloman*, 621 A.2d at 1053 (citation omitted).

To establish a constitutional violation based upon the threat of prosecutorial retaliation, there must be a plausible showing of a causal nexus between the challenged governmental conduct and the absence of testimony that is both favorable and material to the defense. *Id.* at 1054. "The mere advising of one individual of [her] rights where there is a justifiable occasion for doing so, does not in turn infringe upon the constitutional rights of another even though the election to exercise those rights may deprive the other of a possible advantage in his defense." *Commonwealth v. DiGiacomo*, 345 A.2d 605, 607 (Pa. 1975).

The trial court maintains that Sapp's right to present witnesses was not violated because Sandra Dewitt was subpoenaed and present to testify during the trial and because, ultimately, Sapp's counsel agreed to a stipulation being entered in lieu of her testifying. *See* Trial Court Opinion, 12/9/25, at 4-5. We agree with the trial court.

Sapp's claim fails because the Commonwealth did not improperly dissuade Sandra DeWitt from testifying by intimidating her or threatening her with prosecution. The notes of testimony, recounted at length above, do not reveal a single instance of Attorney Kelley threatening Sandra DeWitt with

prosecution. *See* N.T. Jury Trial, 9/9/25, at 171-77, 201-07. Sapp also fails to cite to the place in the record where such a threat occurred, or to identify specific improper statements made by Attorney Kelley; instead, he offers only vague generalizations. *See* Appellant's Brief, at 4 ("The Commonwealth [] raised the possibility that if [Sandra] DeWitt were to testify [regarding the firearm in question], she herself would potentially be charged in relation to the weapons offenses and endangering the welfare of a child."); *see also id.* at 8 (claiming Sapp's right to present defense was "hindered by the Commonwealth raising the possibility that [] Sandra DeWitt might be charged herself in relation to the incident in question if she were to testify on Sapp's behalf"); *id.* at 9 ("[t]he Commonwealth's implication that charges may be pursued against Sandra DeWitt if she were to testify on behalf of Sapp . . . hindered Sapp's constitutional right to call witnesses on his own behalf").[8] Vague allegations of this nature are not sufficient to establish the requisite causal nexus between government conduct and eroded testimony to establish prosecutorial misconduct. *See Holloman*, *supra*. Accordingly, the trial court

---

[8] In fact, Attorney Kelley's admission in the Commonwealth's appellate brief is the strongest evidence this Court has before it that the Commonwealth raised the specter of criminal prosecution prior to the trial court addressing it with Sandra DeWitt. *See* Commonwealth's Brief, at 7 ("In response thereto, the undersigned indicated that on cross[-]examination, [Sandra DeWitt] may subject herself to prosecution depending on her responses."). Even that admission, however, does not indicate whether the statement was made in Sandra DeWitt's presence.

did not abuse its discretion when it concluded that the Commonwealth had not violated Sapp's right to present witnesses.

Sapp next argues that the Commonwealth put forward insufficient evidence at trial to establish that he knowingly created the conditions which endangered the child. *See* Appellant's Brief, at 11. Sapp claims that, because there was no testimony regarding the condition of the room from which the child was brought when the police arrived, who placed the drugs next to the child-care items, or whether the child had ever been exposed to drugs or drug paraphernalia, the evidence was insufficient to establish that he created or failed to mitigate the dangerous conditions, or that he had did so knowingly with specific intent. *Id.* at 11-12.

Our standard of review regarding the sufficiency of evidence is well-settled:

> [W]e evaluate the record in the light most favorable to the verdict[-]winner[,] giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged[,] and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact[-]finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. The Commonwealth may sustain its burden by means of wholly circumstantial evidence.

*Commonwealth v. Delamarter*, 302 A.3d 1195, 1201 (Pa. Super. 2023) (citation omitted).

Section 4304 of the Crimes Code provides, in relevant part, "A parent . . . supervising the welfare of a child under 18 years of age . . . commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection[,] or support."  18 Pa.C.S.A. § 4304(a)(1).  To establish an EWOC conviction, the Commonwealth must prove:  (1) the accused was aware of his duty to protect the child; (2) the accused was aware that the child was in circumstances that could threaten the child's physical or psychological welfare; and (3) the accused either failed to act or took action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.  ***Commonwealth v. Bryant***, 57 A.3d 191, 197 (Pa. Super. 2012) (citations omitted).

EWOC "is a specific intent offense which was enacted in broad terms to safeguard the welfare and security of children."  ***Commonwealth v. Fewell***, 654 A.2d 1109, 1117 (Pa. Super. 1995).  The Commonwealth must establish that the defendant committed a "knowing violation of a duty of care."  ***Delamarter***, 302 A.3d at 1201 (citing ***Commonwealth v. Foster***, 764 A.2d 1076, 1082 (Pa. Super. 2000)).  The Crimes Code defines a knowing *mens rea* as follows:

**(b) Kinds of culpability defined.**--

...

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his

- 18 -

> conduct is of that nature or that such circumstances exist; and
>
> (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S.A. §302(b)(2)(i)-(ii).

Evaluating the record in the light most favorable to the verdict winner and giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence, we find the evidence sufficient to establish each element of EWOC beyond a reasonable doubt. *See Delamarter*, *supra*. The Commonwealth, through Detective Metros' testimony, established that the 9.2 grams of fentanyl recovered from the residence was found near the child's bottle and in a pile of the child's things. While Sapp avers that no evidence was introduced establishing that the child had been exposed to drugs or drug paraphernalia, such evidence is unnecessary to support a conviction for EWOC. *See Commonwealth v. Howard*, 257 A.3d 1217, 1227 (Pa. 2021) (EWOC conviction does not require child suffer particular harm or injury, just "creation of a perilous or dangerous situation"); *see also Commonwealth v. Lynn*, 114 A.3d 796, 824 (Pa. 2015) (finding appellant endangered child's welfare by placing known child molester in situation that gave him access to child). The Commonwealth did not need to establish Sapp's guilt to a mathematical certainty, and the presence of fentanyl in the residence, especially given its proximity to the child's bottle and clothing, was sufficient for the jury to conclude that Sapp was aware that the child was in circumstances that threatened the child's wellbeing. *See Delamarter*,

*supra*; *see also Commonwealth v. Wells*, 335 A.3d 361, at *8-9 (Pa. Super. 2025) (Table)[9] (affirming EWOC conviction where appellant ran psilocybin mushroom growing operation in home where children resided). Accordingly, we conclude that Sapp's sufficiency claim is meritless, and we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

5/1/2026

---

[9] *See* Pa.R.A.P. 126(b) (unpublished, non-precedential memorandum decisions of Superior Court filed after May 1, 2019, may be cited for persuasive value).